UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| AYUR TSYBIKOV, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) Civil Action 19-cv-03334 | |
| | ) | |
| OLEKSANDR DOVGAL, | ) | |
| ALINA KIM, | ) | |
| DVL EXPRESS INC, | ) | |
| ALTEX LOGISTICS INC | ) | |
| Defendants. | ) | |

**AMENDED CLASS ACTION COMPLAINT**

Julia Bikbova
**Bikbova Law Offices, P.C.**
666 Dundee Road, Suite 1604
Northbrook, IL 60062
(847) 730-1800
julia@bikbovalaw.com
ARDC 6291400

*Attorney for Plaintiff*

i

I.      NATURE OF THE CASE ................................................................................................3

II.     PARTIES .......................................................................................................................4

III.    JURISDICTION AND VENUE .....................................................................................6

IV.     RELEVANT STATUES AND REGULATIONS ...........................................................6

        a.  Illinois Wage Payment and Collection Act .......................................................6

V.      PROCEDURAL HISTORY ...........................................................................................8

VI.     STATEMENT OF FACTS ............................................................................................9

VII.    CLASS ALLEGATIONS .............................................................................................18

VIII.   COUNT I ....................................................................................................................29

IX.     COUNT II ...................................................................................................................31

X.      COUNT III ..................................................................................................................35

XI.     COUNT IV ..................................................................................................................40

XII.    COUNT V ...................................................................................................................49

XIII.   COUNT VI ..................................................................................................................53

XIV.    COUNT VII ................................................................................................................56

XV.     COUNT VIII................................................................................................................58

XVI.    COUNT IX ..................................................................................................................61

XVII.   PRAYER FOR RELIEF ..............................................................................................62

Plaintiff Ayur Tsybikov, individually and on behalf of all other similarly situated current and former employees of Defendant companies DVL Express, Inc. ('DVL') and Altex Logistics, Inc. ('Altex'), by his attorney, Julia Bikbova of Bikbova Law Offices, P.C., brings his claims as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, The Illinois Wage Payment and Collection Act, ("IWPCA"), 820 ILCS § 115/2, § 115/3, § 115/4, § 115/5, § 115/9, § 115/10, § 115/13 and § 115/14 and Illinois common law against DVL and Altex, (collectively referred to as "Corporate Defendants" or "Defendant companies"), Oleksandr Dovgal and Alina Kim ("Individual Defendants"), and alleges, based upon the investigation made by his counsel, as follows:

## I.  NATURE OF THE CASE

1. Plaintiff Ayur Tsybikov worked as a truck driver for Defendant Companies DVL and Altex Logistics, which are owned and operated by Oleksandr Dovgal, and Alina Kim. Throughout his employment, he was misclassified as an independent contractor, and consistently underpaid. Defendants made deductions from Ayur Tsybikov's paychecks, which he did not consent to and was not alerted to beforehand. Defendants also forged or "doctored" the logbooks and freight/load confirmations based on which the Plaintiff's compensation was calculated and paid, resulting in underpayment of wages he actually earned.

2. By doing so, Defendant Companies and the Individual Defendants, who controlled them and directed their policies of misclassification of drivers and deductions, violated multiple provisions of the Illinois Wage Payment and Collection Act, 820 ILCS § 115/.

3. Similarly, Defendant Companies and Individual Defendants committed several common law violations- namely, fraud in the inducement, fraudulent misrepresentation, fraudulent concealment, civil conspiracy to commit IWPCA violations and perpetrate fraud in the inducement, fraudulent misrepresentation, and fraudulent concealment.

4.  Plaintiff also seeks equitable relief of accounting, declaratory judgment, and restitution pursuant to the unjust enrichment claim.

5.  Plaintiff Tsybikov is bringing this action on a class basis as to all causes of actions and bases for relief, on behalf of all similarly situated drivers who worked or work at Defendant Companies or any related (sister, parent, subsidiary) companies. The violations experienced by Mr. Tsybikov were not discrete occurrences, but constituted a business model for DVL and Altex. The vast majority of truck drivers who worked or work for said companies were or are misclassified, underpaid, and subjected to illicit deductions.

## II.    PARTIES

6.  Plaintiff Ayur Tsybikov is a resident of Illinois and worked as a truck driver in Illinois, compensated on a per mile basis and later on as a per hauled cargo load basis as a non-exempt employee for Defendant companies in the state of Illinois, during the applicable statute of limitations period, and at all relevant times was a full time "employee" within the meaning of the IWPCA, 820 ILCS § 115/2.

7.  Plaintiff brings this case on behalf of himself and others who currently work, and who previously worked as drivers for Defendants at any time during the relevant statute of limitations preceding the filing of the original complaint (hereinafter "Violation Period").

8.  At all relevant times hereto, Defendant DVL Express Inc. has been an Illinois corporation engaged in transportation and delivery business in Illinois and throughout the United States. DVL conducts business in Illinois and operates facilities in Illinois. Its principal place of business is 2064 W. 167th Str, Markham, IL 60428. Defendant DVL Express has at all relevant times been an "employer" of Plaintiff and other similarly situated truck drivers of Defendant companies within the meaning of the IWPCA, 820 ILCS § 115/2.

9.  Defendant Oleksandr Dovgal is a resident of the State of Illinois, and on information and

belief, is the sole shareholder of DVL and has been its incorporator, founder, registered agent, President, and officer from its inception through to the present day. Defendant Dovgal was and is DVL's key decision maker and its actual executive, who has had and exercised key decision powers with respect to payment of compensation to truck drivers working for the defendant companies, the misclassification of drivers as independent contractors, and deductions made from drivers' compensation. Defendant Dovgal caused or otherwise knowingly permitted DVL to violate provisions of the IWPCA. As such, at all relevant times Defendant Dovgal has been an "employer" of Plaintiffs within the meaning of the IWPCA, 820 ILCS § 115/13.

10. At all relevant times hereto, Defendant Altex Logistics has been an Illinois corporation engaged in transportation and delivery business in Illinois and throughout the United States. Its principal place of business is 2064 W. 167th Str, Markham, IL 60428. Altex Logistics conducts business in Illinois and operates facilities in Illinois. Altex Logistics has at all relevant times been an "employer" of Plaintiff and other similarly situated employees of Defendant companies within the meaning of the IWPCA, 820 ILCS § 115/2.

11. Defendant Alina Kim, wife of Defendant Oleksandr Dovgal, is a resident of State of Illinois, and on information and belief, is the sole shareholder of Altex Logistics and has been its incorporator, founder, registered agent, President, and officer from its inception through to the present day, as well as the key decision maker as to compensation of the drivers and its actual executive. Defendant Kim was and is Altex Logistics' key decision maker and its actual executive, who has had and exercised key decision powers with respect to payment of compensation to truck drivers working for the defendant companies, the misclassification of drivers as independent contractors, and deductions made from drivers' compensation. Defendant Kim caused or otherwise knowingly permitted Altex Logistics to violate

5

provisions of the IWPCA. As such, at all relevant times Defendant Kim has been an "employer" of Plaintiffs within the meaning of the IWPCA, 820 ILCS § 115/13.

12. Defendant Oleksandr Dovgal was and is DVL's and Altex Logistics' key decision maker and its actual executive, who has had and exercised key decision powers with respect to payment of compensation to truck drivers working for either or both defendant companies, the misclassification of drivers as independent contractors, and deductions made from drivers' compensation. Defendant Dovgal caused or otherwise knowingly permitted DVL and Altex Logistics to violate provisions of the IWPCA. As such, at all relevant times Defendant Dovgal has been an "employer" of Plaintiff within the meaning of the IWPCA, 820 ILCS § 115/13.

### III.    JURISDICTION AND VENUE

13. This court has personal jurisdiction over Plaintiff and the class he seeks to represent because putative class members are citizens of the State of Illinois and/or work or worked in the State of Illinois, including this judicial district, for the Defendant companies.

14. This Court has personal jurisdiction over Defendants because the Defendants do business in the State of Illinois, including this judicial district, and their conduct in the State of Illinois, including this judicial district, underlies all claims in this suit. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2) as this matter is a civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which some members of a class of plaintiffs are citizens of a State different from any defendant.

15. Venue is proper in this District pursuant to 28 U.S.C§ 1391(b)(2) because a substantial part of the events or omissions which gave rise to IWPCA violations occurred in the Northern District of Illinois.

### IV. RELEVANT STATUTES AND REGULATIONS

16. The Illinois Wage Payment and Collection Act ((820 ILCS 115/) protects Illinois workers from misclassification, underpayment of wages and compensation, unauthorized deductions, and untimely payment of earned compensation. Just as other Illinois wage laws, the IWPCA is a public interest law.

17. Under Section 2 of the IWPCA, "For all employees, other than separated employees, "wages" shall be defined as any compensation owed an employee by an employer pursuant to an employment contract or agreement between the 2 parties, whether the amount is determined on a time, task, piece, or any other basis of calculation." 820 ILCS 115/2.

18. Under Section 3 of the IWPCA, "Every employer shall be required, at least semi-monthly, to pay every employee all wages earned during the semi-monthly pay period." 820 ILCS 115/3.

19. Under Section 4 of the IWPCA, "All wages earned by any employee during a semi-monthly or bi-weekly pay period shall be paid to such employee not later than 13 days after the end of the pay period in which such wages were earned. All wages earned by any employee during a weekly pay period shall be paid not later than 7 days after the end of the weekly pay period in which the wages were earned. All wages paid on a daily basis shall be paid insofar as possible on the same day as the wages were earned, or not later in any event than 24 hours after the day on which the wages were earned." 820 ILCS 115/4.

20. Under Section 5 of the IWPCA, "Every employer shall pay the final compensation of separated employees in full, at the time of separation, if possible, but in no case later than the next regularly scheduled payday for such employee." 820 ILCS 115/5.

21. Under Section 9 of the IWPCA, "Except as hereinafter provided, deductions by employers from wages or final compensation are prohibited unless such deductions are (1) required by law; (2) to the benefit of the employee; (3) in response to a valid wage assignment or wage deduction order; (4) made with the express written consent of the employee, given freely at the

7

time the deduction is made; (5) made by a municipality with a population of 500,000 or more . . . or (6) made by a housing authority in a municipality with a population of 500,000 or more…" 820 ILCS 115/9.

22. Under Section 10 of the IWPCA, "Employers shall notify employees, at the time of hiring, of the rate of pay and of the time and place of payment. Whenever possible, such notification shall be in writing and shall be acknowledged by both parties. Employers shall also notify employees of any changes in the arrangements, specified above, prior to the time of change." 820 ILCS 115/10.

23. Under Section 13 of the IWPCA, "In addition to an individual who is deemed to be an employer pursuant to Section 2 of this Act, any officers of a corporation or agents of an employer who knowingly permit such employer to violate the provisions of this Act shall be deemed to be the employers of the employees of the corporation." 820 ILCS 115/13.

24. Under Section 14(a) of the IWPCA, "Any employee not timely paid wages, final compensation, or wage supplements by his or her employer as required by this Act shall be entitled to recover through a claim filed with the Department of Labor or in a civil action, but not both, the amount of any such underpayments and damages of 2% of the amount of any such underpayments for each month following the date of payment during which such underpayments remain unpaid. In a civil action, such employee shall also recover costs and all reasonable attorney's fees. 820 ILCS 115/14.

## V. PROCEDURAL HISTORY

25. The instant matter was instituted via a Class Action Complaint, filed by Plaintiff in the Circuit Court of Cook County, Illinois, Chancery Division, on February 13, 2019 under Civil Action No. 2019-CH-01814. The Complaint alleged seven causes of action, with counts for violations of the IWPCA, common law fraud, civil conspiracy, declaratory judgment,

8

accounting, and unjust enrichment.

26. On February 14, 2019, Plaintiff filed (lodged) a Motion for Class Certification Pursuant to Rule 5/2-801 of the Illinois Code of Civil Procedure.

27. On April 4, 2019, Plaintiff filed a Motion for Default Judgment.

28. On May 9, 2019, Defendants filed a Motion to Quash Service of Process of Plaintiff's Complaint.

29. On May 17, 2019, Defendants filed a Notice of Removal to this Court.

## VI. STATEMENT OF FACTS

Plaintiff Ayur Tsybikov's employment

30. During the time of Plaintiff's and others' similarly situated employment with the Defendants, he worked as a truck driver delivering goods across state lines.

31. Mr. Tsybikov worked for DVL as a truck driver between August 2014 and August 2017. He was hired by DVL to work for DVL and its related companies, and drove a truck with DVL branding; Mr. Tsybikov also occasionally pulled loads for Altex Logistics and believes he has been compensated by Altex from time to time.

32. Ayur Tsybikov learned of the truck driver position at Defendant companies through a friend who was employed by Defendants; the friend was leaving the company's employment, and knew that a position would be open.

33. In early August of 2014, Defendant Dovgal conducted a phone interview with Mr. Tsybikov. Mr. Tsybikov was at home, and Defendant Dovgal, presumably was at his DVL office.

34. During Mr. Tsybikov's interview, Defendant Dovgal told him that he could only work for Defendant Company and no other trucking company, and that this would be a full-time commitment on his part. Defendant Dovgal said that he would pay Mr. Tsybikov $0.48 for each mile driven, and said that if he agreed, he could have the job.

35. Defendant Dovgal said to Plaintiff that he always pays his drivers in full all they are promised

and on time. This was the first job as a truck driver that Mr. Tsybikov to be had and he had no

reason to expect that he would be misclassified, underpaid, defrauded.

36. Mr. Tsybikov accepted the offer. In fact, this agreement's terms were reflected in the very first

paycheck and settlement report that Mr. Tsybikov received, under which he was paid 48 cents

per mile for the work he performed but was not paid for all the work he performed.

37. For the first year of Mr. Tsybikov's employment as a company driver, he does not recall signing

any documents or contracts and certainly is not in possession of any such documents.

38. A year later, Defendant Dovgal told Mr. Tsybikov to sign a lease agreement. This lease

agreement formed part of a misclassification scheme common in trucking companies: Plaintiff

would lease a truck from Defendants, and then lease it back to them in order for Defendant

companies to enable their drivers to drive under Defendant companies' DOT number and motor

carrier authority. Defendant Dovgal said that if Mr. Tsybikov refused to participate in this

arrangement, his employment would be terminated.

39. Plaintiff's employment was made up of three phases: first, he worked as a driver compensated

on a per mile basis between August 2014 – July 2015- for the first four months he was paid

$0.48 per mile, and thereafter was paid $0.53 per mile. In the second phase, he then worked

as a driver compensated on a percentage of a load/freight confirmation basis ("per load" basis)

from July 2015 until May 2017. In May 2017, he signed a bill of sale for his truck he

purchased from DVL in order to become a quasi-owner-operator until he left the company in

August 2017.  During this "owner-operator" phase, he was also paid on a per load basis.

40. The Defendants failed and refused to pay Plaintiff and others similarly situated for some work

performed during each of these three phases.

41. When Plaintiff worked on a per mile basis, Defendants only paid him for approximately 90%

of the miles he drove, decreasing his compensation by approximately 10%. Plaintiff drove an

average of 13,000 miles a month during the period that he was compensated on a per mile basis; as his agreed rate of pay was to be $0.48/mile for the first four months and $0.53/mile for the next six months, he was underpaid by at least $6,630 during his ten months spent driving on a per mile basis. The reduction in the miles he drove for Defendant companies and based on which he was compensated, arose as a result of the Defendant companies "doctoring" or falsifying the logbooks after Mr. Tsybikov would submit them to Defendant companies' offices.

42. Mr. Tsybikov noticed he was being underpaid, and immediately spoke to other drivers, who reported they have experienced similar underpayment for a long period prior, including prior to Mr. Tsybikov's employment with Defendant companies.

43. When Plaintiff transitioned to compensation on a per load basis in July of 2015, he was given some papers to sign, and had a conversation with Defendants Dovgal and Kim at their office. Defendant Dovgal promised to pay him fairly, and told him, in Russian, that Dovgal didn't "doctor" any figures, and that Plaintiff would be paid 90% of the actual freight confirmation, and 88% of the same for a partial load, and that he would pay on time. Defendant Kim explained that the only deductions from his compensation would be the standard "lease" payments each month for truck and trailer and insurance, and that he would not be "charged" for any violations or repairs.

44. During Plaintiff's employment as a per load driver, he received plausible freight confirmation figures at first, and then the rates began decreasing. At one point, during the second half of 2015, he received a freight confirmation for $800 and called the broker to check, and the broker said the true confirmation had actually been $1,000. Defendant DVL's dispatcher, and later on Dovgal himself, insisted that $800 was the correct sum, and refused to pay more, thus underpaying Plaintiff by 20%.

45. In sum, throughout his employment with Defendant companies, nearly 90% or more of freight confirmations, based on which Mr. Tsybikov was paid, were doctored or otherwise falsified by Defendant companies.

46. Upon speaking to other drivers, Plaintiff learned that those paid per load had also been underpaid for many years prior to Plaintiff's employment with Defendant companies but that they were afraid to complain.

47. During Plaintiff's first phase of employment, August 2014-July 2015 as a per mile driver, he was charged $5,500 in deductions from his pay, for reasons such as 'violation' or 'bad tires', which were never discussed or agreed upon. He was also underpaid by approximately 10% of all miles driven; he drove an estimated 13,000 miles per month, and so was underpaid by an approximate $2,496 for his first four months and $5,512 for the next eight months. In total, Plaintiff was underpaid by a total of $16,008.

48. In the 48 months since, $25,405.82 in statutory interest under the IWPCA has accrued, for a total of $41,413.82 to the date of filing this complaint.

49. During Plaintiff's second phase of employment, July 2015-May 2017, when he was paid per load as a company driver, he was charged $4,122 in deductions which were never discussed or agreed upon. These included $800 for towing and $3,322.44, deducted over four paychecks, for 'DVL claim' and 'improper delivery conduct'.

50. During this period, or "phase II", Plaintiff was also underpaid for each load by approximately $1,000 per month for twenty months due to Defendant companies paying him based on doctored or falsified freight confirmations. In total, Plaintiff was underpaid by a total of $24,122; in the 26 months since, $16,244.19 in statutory interest under the IWPCA has accrued, for a total of $40,366.19 to the date of filing this complaint.

51. During Plaintiff's third phase of employment, May 2017-August 2017, when he was paid per

12

load as a quasi owner-operator, he was charged $9,330 in deductions which were never discussed or agreed upon. These included $890 for 'truck repair'; $940 for 'violation'; $2,000, $2500 in 'claims for load'; $2,700 for 'bad tires'; and $300 for 'chains'. During this period, Plaintiff was also underpaid for each load by approximately $1,000 per month for four months due to Defendant companies paying him based on doctored or falsified freight confirmations.

52. In total, Plaintiff was underpaid by a total of $13,330 during "phase III"; in the 22 months since, $7,277.91 in statutory interest under the IWPCA has accrued, for a total of $20,607.91 to the date of filing this complaint.

53. Altogether, Plaintiff's damages, inclusive of statutory interest but exclusive of any attorney's fees or filing costs, total $102,387.92.

54. All freight confirmations are strictly in the possession of Defendants. Thus, until full discovery or a full accounting is received, Plaintiff cannot precisely list every instance of underpayment.

Defendants' control over Plaintiff's employment

55. Defendant Oleksandr Dovgal ("Defendant Dovgal") and Defendant Alina Kim ('Defendant Kim') and other personnel of Defendant companies managed all of the Plaintiff's and others' similarly situated work for Defendant Companies, including the number of hours worked, the distances driven, and the tasks performed by Plaintiff and others similarly situated, including owner-operators.

56. Defendants Dovgal and Kim and other personnel of Defendant companies exerted full control over Plaintiffs' workdays and working conditions. They dictated, controlled and ratified the wages paid, hours worked, tasks set, and all related employee compensation policies and practices, including that of company drivers and owner-operators.

57. Defendants Dovgal and Kim and other personnel of Defendant companies required Plaintiff

and all other similarly situated truck drivers to review and sign company paperwork in complicated legalese English presented to them at the head office and to complete the inspection of the equipment alongside Defendants' officers at the head office. They also required the Plaintiff and all other similarly situated truck drivers to submit to mandatory drug testing in nearby Illinois facilities in order to commence employment. These were mandatory conditions of employment, which Plaintiff had to fulfill in order to continue working for Defendant companies.

58. Defendants Dovgal and Kim required Plaintiff and others similarly situated to use the Defendants' vehicles in performance of their duties, which were registered in Illinois and owned by Illinois-registered companies and displayed "DVL" signs on the vehicle siding; this company branding is solely owned and managed by Defendants Dovgal and Kim. As a result, Plaintiff and similarly situated drivers exclusively drove vehicles with the Defendants' branding. The requirement of displaying Defendant companies' signs, branding and DOT MC numbers was equally imposed on all owner-operators, including Plaintiff when he worked as owner-operator and as a "lease" based driver, as a condition of employment.

59. Some drivers, beginning with around 2014-2015, as in the case of Plaintiff, were required to execute lease agreements to "lease" equipment, *e.g* the truck and trailer, from Defendant companies while one of the Defendant Companies remained the sole owner of such equipment at all times. Specifically, Plaintiff leased his truck from DVL, immediately "lease" the truck back to DVL, and would carry loads for either DVL or Altex Logistics under either company's DOT motor carrier authority.

60. Such leases, which the Plaintiff was made to sign, were nothing more than part of the Defendants' intricate, unlawful scheme to misclassify the Plaintiff and others similarly situated drivers as independent contractors, as opposed to W-2 form employees. "Lease"

drivers, including Plaintiff, were strictly prohibited from using the trucks in their possession "leased" from DVL to haul loads of any other company but DVL and related to DVL and to work for any other employer.

61. At least approximately 10% of the cargo that the Defendants required the Plaintiff and putative class members to transport was cargo deliveries to and from the Defendants' customers located in Illinois. In furtherance of their transport duties and work for the Defendants, the Plaintiff and other similarly situated truck drivers spent approximately thirty percent of their time or more commuting through the State of Illinois, regardless of whether Defendants' customers were in Illinois or not. All of the instructions that the Plaintiff and putative class members would receive came from Defendant companies' dispatchers in Illinois. On information and belief, approximately 70% of the putative class members permanently reside in the State of Illinois.

62. With respect to the owners-operators of their own trucks who worked for Defendant companies, Defendant companies and their executives, Individual Defendants, controlled every aspect of the drivers, including Plaintiff's, work. Such control included, but was not limited to the following:

   a. Defendant companies required Plaintiff and other similarly situated drivers to comply with instructions dictated by written and unwritten policies, procedures, and directives regarding Plaintiffs' and other similarly situated drivers' duties.

   b. Plaintiff, as well as other similarly situated drivers, were required to report to or contact dispatchers employed by the Defendant companies in Illinois, at a pre-set time determined by Defendant companies, at which time the Plaintiff and other similarly situated drivers are provided with delivery assignments.

   c. Plaintiff and other similarly situated drivers were instructed by Defendant companies

which loads to pick up, the location of the loads/goods to be delivered, as well as the time the goods will be loaded onto the equipment. Plaintiff and other similarly situated drivers had and have no discretion with respect to which loads they would pick up or deliver or when. Additionally, the Defendant companies dictated and dictate the time by which the delivery must be made.

d. Defendant companies employed and employ managers who had supervisory responsibility over Plaintiff and other similarly situated drivers, and who could and did assign and direct their work.

e. Plaintiff and other similarly situated drivers were required to purchase and carry GPS, which allows the Defendant companies' personnel to track where the drivers are throughout the day. Defendant companies' dispatchers and supervisors also communicated with the Plaintiff and similarly situated drivers while they are driving via telephone in order to convey instructions and otherwise oversee the drivers.

f. In order to be hired as owners-operators, the Plaintiff and other similarly situated drivers were required to undergo background checks and drug tests.

g. Defendant companies required Plaintiff and other similarly situated drivers to obtain insurance from an insurer dictated by Defendant companies in specific amounts such as nontrucking liability insurance, occupational accident insurance, property damage and cargo insurance.

h. If the Plaintiff or other similarly situated drivers wish to take a time off, the Defendant companies required them to give timely advanced notice, and the Plaintiff and other similarly situated drivers would be disciplined or terminated if they failed to provide such notice.

i. Defendant companies' personnel advised Plaintiff and other similarly situated drivers

that their refusal to drive a load that had been assigned to them would result in immediate termination of their employment.

63. As part of their strict control over Plaintiff's work, Defendants Dovgal and Kim required that the Plaintiff and putative class members submit all bills of lading, logbooks, and other required paperwork to the Defendant Companies' head office in Illinois. This requirement was imposed on drivers operating Defendant companies' equipment and owner-operators.

64. At no time during his employment, be it as a company equipment driver or owner-operator, could the Plaintiff and other similarly situated drivers have their own customers and never had their own customers, could not choose and did not choose their own routes for delivery of cargo, could not and did not receive compensation or otherwise exchanged payment for their delivery other than being compensated by the Defendant companies, could not and did not negotiate any matters or bargains with any customers or brokers.

65. Plaintiff and other similarly situated truck drivers shared similar job titles, followed the same policies and practices, performed similar duties, and as a result of Defendants' common scheme and unlawful deductions, were similarly subject to exploitation and denied compensation.

66. Defendants engaged in unlawful practices by refusing to withhold payroll and social security taxes or to pay their share of social security tax and unemployment tax for the benefit of Plaintiff, and as to others similarly situated, thus causing Plaintiff and others similarly situated damages in the amount of unpaid FICA and withheld taxes and additional sums to be paid by the Plaintiff and others similarly situated in place of Defendants.

Liability of individual defendants Dovgal and Kim

67. Defendants Dovgal and Kim had knowledge of the mutual assent between the Plaintiff and the Defendant companies to compensate the Plaintiff for all of his work because it were the

17

individual Defendants who offered the employment to the Plaintiff and promised to compensated in full and on time based on a certain rate.

68. Defendants Dovgal and Kim similarly had knowledge of mutual assent between Defendant companies and other drivers as to the drivers working for the Defendant companies in return for compensation based on per mile basis or per hauled load basis and that the mutual assent to employment terms was formed based on promises to pay in full and on time.

69. Dovgal and Kim had knowledge of all agreements that the putative class members executed with Defendant companies because Dovgal and Kim were the ones to proffer such agreements to the drivers and execute such agreements on behalf of the Defendant companies.

70. Individual Defendants had actually entered into various agreements with Plaintiff and other similarly situated drivers (putative class members) on behalf of the Defendant Companies, be it oral agreements of employment, "lease agreements", Independent Contractor Agreements, "purchase agreements", or "bills of sale", and had induced the Plaintiff and other similarly situated drivers to enter one or more of said agreements in order to work for the Defendant companies as a result of promises by Dovgal and Kim that Defendant companies would pay the drivers the promised compensation in full and on time and that paying drivers' compensation in full and on time was what the DVL and Altex were doing.

71. Defendants Dovgal and Kim had knowingly permitted or otherwise caused the Defendant companies to wrongfully deny the payment of compensation to Plaintiff and putative class members by actively and affirmatively directing the Defendant companies' personnel to deny the earned and promised compensation.

72. Both individual Defendants established policies for Defendant companies which violated the IWPCA: (1) at the beginning of running their transportation services enterprise, on or about September of 2011, when DVL Express was incorporated, Dovgal and Kim devised a scheme

to misclassify the truck drivers as Independent Contractors and consequently, (2) underpay the Plaintiff and putative class member truck drivers, and (3) make deductions from the compensation of Plaintiff and other similarly situated drivers.

73. Once the Defendant companies began hiring drivers, Defendants Dovgal and Kim implemented their scheme to violate IWPCA and commit fraud by having: (1) instructed Defendant companies' personnel employees to issue the paychecks which reflected underpaid or reduced compensation and instructing Defendant companies' personnel to apply various deductions to Plaintiff's compensation and compensation of similarly situated drivers; (2) as in some instances, refused to issue, or directed the Defendant companies' personnel to refuse to issue, any paychecks at all to Plaintiff and other similarly situated drivers- putative class members; and (3) instructed Defendant companies personnel to doctor or otherwise falsify log books and freight/load rate confirmations.

74. Defendants Dovgal and Kim implemented their exploitative scheme in full knowledge that most of the truck drivers they hired would take the job offered, not complain about underpayment of wages, and not seek any recourse in court or otherwise with government authorities. Dovgal and Kim targeted drivers who were and are immigrants, had low English language proficiency and lacked legal sophistication, so as to ensure a consistent power imbalance, which the individual Defendants used to their advantage and profit.

75. Instead of running an honest business, Defendants Dovgal and Kim designed the above-described scheme of deductions and wage withholdings to take money from hard-working, vulnerable employees who could not or would not fight back.

76. Defendant companies' practices, as set up and implemented by Individual Defendants, violated multiple provisions of the Illinois Wage Payment and Collection Act.

77. As a result of Defendant companies' unlawful practices, as set up and implemented by

Individual Defendants, the Defendant companies and Individual Defendants profited immensely. They benefited from reduced labor and payroll costs by making illegal deductions and otherwise withholding pay from Plaintiff and similarly situated drivers, as well as by doctoring logbooks and freight/load confirmations.

78. As a result of Individual Defendants' improper and willful actions causing the Corporate Defendants to fail to pay Plaintiff and others similarly situated in accordance with the requirements of the IWPCA, Plaintiff and others similarly situated putative class members suffered lost wages and other actual damages.

79. Plaintiff further alleges that in addition to statutory violations, Individual Defendants engaged in a pattern of fraudulent inducement, fraudulent misrepresentation and fraudulent concealment as to him and similarly situated drivers. Defendants Dovgal and Kim also conspired to commit these common law offenses and the IWPCA violations, personally and on behalf of their respectively owned companies.

## VII. CLASS ALLEGATIONS

80. Plaintiff brings these claims for relief on his own and as a class action pursuant to Fed R. Civ. P. 23. The class is defined as:

> *"All persons who have worked for Defendant companies as truck drivers and truck driver trainees in Illinois or otherwise have driven Defendant companies', their predecessors', successors', subsidiaries' and/or affiliated companies' trucks at any time during the relevant statutory period, and who entered into an Independent Contractor agreement individually or on behalf of another entity, oral or written, and personally provided freight cargo transportation services pursuant to that Agreement for Defendant companies and who have not been classified as employees of Defendant companies"*. (Count I).

20

*"All persons who have worked for Defendant companies as truck drivers and truck driver trainees in Illinois or otherwise have driven Defendant companies', their predecessors', successors', subsidiaries' and/or affiliated companies' trucks at any time during the relevant statutory period, and personally provided freight cargo transportation services, to whom the Individual Defendants or Corporate Defendants' personnel made numerous misrepresentations of material facts, and from whom the material facts were withheld, in order to induce them to accept employment offers and conditions to their detriment; and thus, common law fraud in inducement was perpetrated against them."* (Count II).

*"All persons who have worked for Defendant companies as truck drivers and truck driver trainees in Illinois or otherwise have driven Defendant companies', their predecessors', successors', subsidiaries' and/or affiliated companies' trucks at any time during the relevant statutory period, and personally provided freight cargo transportation services, to whom the Individual Defendants or Corporate Defendants' personnel made numerous misrepresentations of material facts, and from whom the material facts were withheld, and thus, common law fraudulent misrepresentation was perpetrated against them."* (Count III).

*"All persons who have worked for Defendant companies as truck drivers and truck driver trainees in Illinois or otherwise have driven Defendant companies', their predecessors', successors', subsidiaries' and/or affiliated companies' trucks at any time during the relevant statutory period, and personally provided freight cargo transportation services, from whom the Individual Defendants or Corporate Defendants' personnel concealed material facts; and thus, common law fraudulent concealment was perpetrated against them."* (Count IV).

*"All persons who have worked for Defendant companies as truck drivers and truck driver trainees in Illinois or otherwise have driven Defendant companies', their predecessors', successors', subsidiaries' and/or affiliated companies' trucks at any time during the relevant statutory period, and personally provided freight cargo transportation services, to whom Individual Defendants or Corporate Defendants' personnel made fraudulent misrepresentations in the form of forged freight confirmations, and thus, common law fraudulent misrepresentation was perpetrated against them."* (Count V).

*"All persons who have worked for Defendant companies as truck drivers and truck driver trainees in Illinois or otherwise have driven Defendant companies', their predecessors', successors', subsidiaries' and/or affiliated companies' trucks at any time during the relevant statutory period, and personally provided freight cargo transportation services, against whom the Individual Defendants, on behalf of themselves and their respective Corporate Defendants, committed Civil Conspiracy to violate IWPCA and perpetrate Common Law Fraud (promissory fraud, fraudulent misrepresentation or fraudulent concealment)."* (Count VI).

*"All persons who have worked for Defendant companies as truck drivers and truck driver trainees in Illinois or otherwise have driven Defendant companies', their predecessors', successors', subsidiaries' and/or affiliated companies' trucks at any time during the relevant statutory period, and personally provided freight cargo transportation services pursuant to Independent Contractor Agreement, oral or written, for Defendant companies and who have not been classified as employees of Defendant companies",* who are entitled to Declaratory Judgement as to the current employees that they are unlawfully misclassified and are therefore

*employees and not independent contractors and are entitled to all compensation they earned without any unjustified deductions."* (Count VII).

*"All persons who have worked for Defendant companies as truck drivers and truck driver trainees in Illinois or otherwise have driven Defendant companies', their predecessors', successors', subsidiaries' and/or affiliated companies' trucks at any time during the relevant statutory period, and personally provided freight cargo transportation services pursuant to Independent Contractor Agreement, oral or written, for Defendant companies and who have not been classified as employees of Defendant companies"*, *who are entitled to Order for Accounting by Defendants to determine all freight confirmations pursuant to which the compensation was to be made, original log books pursuant to which the compensation per mile was to be made, and all records of earned compensation, paid or unpaid."* (Count VIII).

*"All persons who have worked for Defendant companies as truck drivers and truck driver trainees in Illinois or otherwise have driven Defendant companies', their predecessors', successors', subsidiaries' and/or affiliated companies' trucks at any time during the relevant statutory or common law period, and personally provided freight cargo transportation services, who are entitled to restitution of unpaid wages for all benefits conferred upon the Defendants, corporate and individual, based on the Unjust Enrichment equitable relief basis."* (Count IX).

81. The class or subclasses of plaintiffs, estimated 1000 drivers, is so numerous that joinder of all members is impracticable;

82. There are common questions of law and fact as to whether Defendants improperly misclassified the drivers as independent contractors and the drivers were and are in fact covered by the IWPCA; whether the drivers are entitled to recover the amounts deducted by the

Company from their wages and an unpaid but earned compensation; that each driver has the same potential claim and types of damages, and these common questions of law and fact predominate over any possible questions affecting only individual members;

83. The named Plaintiff and his attorney will adequately protect the interests of the entire class.

84. Class treatment in this particular case is the only appropriate means for the fair and efficient adjudication of the controversy because of the length of the dispute, the intimidation and retaliation threats and actions by Defendant over the course of many years, the amount of individual damages and the prohibitive costs of individual suits.

**Numerosity**

85. The total number of members of the proposed class represents approximately 1000 individuals or more. The exact number of class members may only be determined from Defendants' records. The proposed class is sufficiently numerous to make joinder of all of its members impracticable.

86. The proposed class of approximately 1000 Defendants' truck drivers, who were misclassified as independent contractors, denied full wages, proper payroll contributions and were not covered by workers' compensation and unemployment insurance, to name just a few of Plaintiff's contentions, represent a sufficient number of individuals with respect to their complaint against Defendants.

87. The amount of each claim is relatively small compared to the costs of bringing an individual claim, particularly when considering filing fees, motion practice, discovery, and the costs of commuting to depositions, appearing in court, hearings, and trial.

88. The amounts of Plaintiff's and putative class members' claims are very similar and range approximately between approximately $1,500 and $55,000, depending on the length of the employment, not including statutory interest and attorneys' fees and costs. These amounts are

based on what Plaintiff can ascertain based on documentation he currently possesses, and could change upon the review of all relevant documentation in possession of Defendants. The amounts claimed vary based on the length of truck drivers' employment with Defendants. The amounts do not include contributions under FICA, penalties and interest which may only be determined after determining the full compensation that Defendant was required to pay Plaintiff.

89. The putative class members do not have the ability to bring the claims on their own behalf because of the prohibitive costs. Even if they had the ability to bring a suit on their own behalf, the likelihood of them doing so would be close to zero.

90. The Plaintiff believes that Defendants would intimidate Plaintiff and putative class members and Plaintiff and putative class members would not be able to oppose the Defendants if they were to stand up for their rights in court individually. Defendants oppressed them, violated their rights repeatedly and without any remorse, and intimidated them throughout the length of Plaintiff's and putative class members' employment. Defendants are highly likely to continue with the same tactics if Plaintiff and other drivers were to sue individually or as a joinder.

91. There are at least approximately 1000 putative class members scattered across Illinois and the United States, who are truck drivers involved in an ongoing commute. It would be impractical and impossible for the Plaintiff to prosecute their claims individually or as a joinder because of geographic constraints.

92. The proposed class is made up of the "smaller guy". The class consists of individual truck drivers, who, for the most part, are newly licensed commercial drivers, who are not sufficiently sophisticated to seek legal redress individually.

93. Joinder of all or even a substantial percentage of class members as individual plaintiffs clearly

would be prohibitively expensive and impracticable for the same reason as if plaintiffs were to bring their claims individually.

### Commonality

94. All of Plaintiff's and putative class members' claims have common questions of law because they all arise pursuant to violations of IWPCA and other common law causes of action, as described in this Complaint. There are numerous and substantial questions of law and fact common to all members of the stated class, including, but not limited to, the following:

95. Whether Defendants unlawfully misclassified putative class members as independent contractors as opposed to W2 employees;

96. Whether Defendants failed to pay "wages" and "final compensation" by making unlawful deductions or withholdings from Plaintiffs' paychecks;

97. Whether Defendants failed to make proper payroll contributions and other tax contributions and withholdings on behalf of Plaintiffs;

98. Whether Defendants failed to compensate class members for all the work they required according to the rate and wages Defendants promised to pay Plaintiffs and others similarly situated at hiring;

99. Whether Defendants engaged in a pattern, practice or policy of making unlawful deductions from the pay of class members;

100.    Whether Defendants willfully failed to comply with state wage laws pursuant to IWPCA;

101.    Whether Defendants failed to pay final compensation to members of the proposed class, on time and in full, in accordance with IWPCA;

102.    Whether Defendants failed to compensate the truck drivers-trainees, to whom the Defendant promised compensation and with whom Defendants formed an employment agreement for trainees' training for benefit of Defendants and provision of services to

Defendants;

103.     Whether Defendants violated Section 3 of IWPCA which requires that every employer, at least semi-monthly, pay every employee all wages earned during the semi-monthly pay period. 820 ILCS 115/3;

104.     Whether Defendants violated Section 4 of IWPCA which requires that all wages earned by employee during the semi-monthly or bi-weekly pay period be paid to such employee not later than 13 days after the end of the pay period in which such wages were earned. 820 ILCS 115/4;

105.     Whether Defendants violated Section 5 of IWPCA which requires every employer to pay final compensation of separated employees in full, at the time of separation, if possible, but in no case later than the next regularly scheduled payday for such employee. 820 ILCS 115/5;

106.     Whether Defendants violated Section 9 of IWPCA which dictates that deductions by employers from wages or final compensation are prohibited unless such deductions are (1) required by law; (2) to the benefit of the employee; (3) in response to a valid wage assignment or wage deduction order; (4) made with the express written consent of the employee, **given freely at the time the deduction is made** […]. 820 ILCS 115/9. *(emphasis added)*;

107.     Whether Defendants violated Section 10 of IWPCA, when they failed to notify employees, at the time of hiring, of the actual rate of pay and of the time and place of payment; when they failed to memorialize such notification in writing although it was feasible; when they failed to assure that both parties, the Employer and the prospective truck driver, acknowledge such notification in writing; when Defendants failed to notify employees of any changes in the arrangements, specified above, prior to the time of change; when Defendants failed to keep records of names and addresses of all employees and of wages paid each payday, and when Defendants failed to furnish each employee with an itemized statement of

deductions made from their wages for each pay period. 820 ILCS §115/10.

108.     Whether individual Defendants Dovgal and Kim are liable for violations of IWPCA.

109.     Whether Defendants are liable for fraud in the inducement, fraudulent misrepresentation, fraudulent concealment, conspiracy to commit the aforementioned fraud, and conspiracy to violate the IWPCA.

110.     Whether Plaintiff and all class members are entitled to equitable relief pursuant to their actions for accounting, declaratory judgment, and unjust enrichment.

111.     Upon information and belief, there are no other class members who have an interest individually controlling the prosecution of his or her individual claims, especially in light of the relatively small value of each claim and the difficulties involved in bringing individual litigation against one's employers. However, if any such class member should become known, he or she can "opt out" of this action in accordance with federal rules of civil procedure as applicable to actions pursuant to IWPCA.

112.     Plaintiff anticipates that Defendants will raise defenses that are common to the class.

**Typicality**

113.     The named Plaintiff is an adequate representative of the class because all potential plaintiffs were subject to Defendants' uniform practices and policies. Further, the named Plaintiff and the potential class plaintiffs have suffered the same type of damages as a result of Defendants' practices and policies.

**Adequacy**

114.     The named Plaintiff will fairly and adequately protect the interests of the class.

115.     Plaintiff is ideally situated to represent three potential sub-classes: (1) company truck drivers compensated on a per mile basis; (2) company truck drivers operating under "lease" agreements and compensated on a percentage of a freight/load confirmation basis; and (3)

owner-operators of their trucks and compensated on a percentage of a freight/load confirmation basis, as he worked under all three categorizations for Defendant companies.

116.    Plaintiff's interests are not and cannot be antagonistic or in conflict with the class as Plaintiff and all members of proposed class would like to seek compensation for the work they performed. The named Class Representative and proposed class members have the common interest of determining whether Defendants are liable for money damages to the proposed class for violations of their rights under IWPCA, and under causes of action under Illinois Common Law as set forth in this Complaint.

117.    Plaintiff has retained experienced counsel who is competent in handling complex litigation with many years of experience in prosecuting Wage and Hour actions in Illinois state court, and recently in Federal Court, including numerous Class Action lawsuits pursuant to IWPCA.

**Rule 23(b) Class Action Maintainable**

118.    Finally, a class action is the only realistic method available for the fair and efficient adjudication of this controversy. The expense and burden of individual litigations makes it impractical for members of the Class to seek redress individually for the wrongful conduct alleged herein. Were each individual member required to bring a separate lawsuit, the resulting multiplicity of proceedings would cause undue hardship and expense for the litigants and the Court and would create the risk of inconsistent rulings which would be contrary to the interest of justice and equity.

**VIII. COUNT I: VIOLATIONS OF THE ILLINOIS WAGE
PAYMENT AND COLLECTION ACT**

119.    Plaintiffs re-allege and incorporate paragraphs 1 through 118 above as and for paragraph 119 of this Count I.

120.    Each corporate Defendant is an "employer" within the meaning of Section 115/2 of

IWPCA. Each individual Defendant is an "employer" within the meaning of Section 115/2 of the IWPCA.

121.    Defendants violated Section 115/2 of the IWPCA by misclassifying Plaintiff and those similarly situated.

122.    Defendants violated Section 115/3 and Section 115/4 of the IWPCA by failing to pay Plaintiff and those similarly situated their wages in a timely manner.

123.    Defendants violated Section 115/5 of the IWPCA by failing to pay Plaintiff his final compensation in full and in a timely manner.

124.    Defendants violated Section 115/9 of the IWPCA by making unauthorized deductions from the paychecks of Plaintiff and those similarly situated. These deductions were not required by law, did not benefit Plaintiff, were not made in response to a valid wage assignment order, and were not made with the express written consent of employees.

125.    Defendants violated Section 115/10 of the IWPCA by failing to notify Plaintiff and those similarly situated of their true rate of pay in writing or orally at any point.

126.    The total amount Mr. Tsybikov's damages for the three years of his employment with Defendant companies is approximately **$55,082** without interest accrued, and **$102,387.92** with interest accrued to date but excluding attorney's fees and costs.

127.    Individual Defendants Dovgal and Kim are personally liable for the corporate Defendants' violations of the IWPCA, pursuant to Section 115/13 of the IWPCA because they intentionally or otherwise knowingly permitted Corporate Defendants to violate IWPCA.

128.    Defendants are liable for all interest incurred, and attorney's fees and costs, pursuant to Section 115/14 of the IWPCA.

Punitive Damages

129.    Defendants knowingly and willfully violated the IWPCA, being employers, who, being

able to pay wages, and being under a duty to pay, willfully refused to pay as provided in the IWPCA, with intent annoy, harass, oppress, hinder, delay and defraud their drivers.

## IX. COUNT II: FRAUD IN THE INDUCEMENT

130. Plaintiff re-alleges and incorporates paragraphs 1 through 129 above as and for paragraph 130 of this Count III:

**Fraud in the inducement at initial hiring**

131. During Mr. Tsybikov's phone interview with Defendant Dovgal in early August of 2014, Defendant Dovgal made the following false statements of material facts to him orally:

    a. That he, Dovgal, ran an honest business and paid his current employees, as of August, 2014, on time and in full as promised at hiring;

    b. That he, Dovgal, would pay Mr. Tsybikov on time and in full if he became his employee;

    c. That he, Dovgal, would pay Mr. Tsybikov for his work for a certain rate of $0.48 cents per mile initially and then raise the rate of compensation.

132. Defendant Dovgal withheld material facts from Mr. Tsybikov at time of interview, namely, that Dovgal's companies, one or more Corporate Defendants in this case, were in fact not paying their drivers, who driver for pay on a per mile basis, for all miles they were driving for the Defendants, that the logbooks were often doctored or falsified, that the deductions, unagreed to and unjustified, were constantly taken from the drivers' compensation.

133. Defendant Dovgal consistently and repeatedly underpaid Plaintiff his wages and compensation when driving for Defendants, and has yet to pay him the amount owed.

134. Defendant Dovgal knew that these statements and representations to Mr. Tsybikov were false when he made such statements and representations, as well as withheld material

information, because Defendants Dovgal and Kim, as well as Corporate Defendants' personnel under the direction and control of Dovgal and Kim, had consistently and repeatedly underpaid all of the truck drivers who worked for Defendant since the founding of their companies.

135.    Defendants Dovgal and Kim developed a scheme to present false statements to Mr. Tsybikov while never intending to comply with those promises and knowing that Mr. Tsybikov would not uncover this fraudulent scheme until after he had been induced to accept an employment offer and commenced working.

136.   Defendant Dovgal clearly and unequivocally intended that his statements of material facts to Mr. Tsybikov at hiring and withholding of material facts from him would induce Mr. Tsybikov to accept the employment offer and begin working for Dovgal's companies, one of the Defendant companies.

137.   Mr. Tsybikov did rely on false statements of material facts and withheld  material information by individual Defendant Dovgal when he accepted the job offer with Dovgal's companies.

138.   Mr. Tsybikov's damages stem from his reliance on individual Defendant Dovgal's false statements of material facts and withholding of material facts when he accepted a job offer, commenced work, and continued to work for Defendant companies. His actual damages sustained are in the amount of unpaid wages.

139.   That Defendants Dovgal and Kim and Corporate Defendants had no legal basis to defraud Mr. Tsybikov and not pay him proper compensation he earned and was promised at hiring.

140.   That any and all misrepresentations of material facts or otherwise fraudulent misrepresentations to induce Mr. Tsybikov's acceptance of job offer were made by Defendant Dovgal on behalf of and for the benefit of Defendant companies and Defendant Kim, as well

as to his own personal benefit.

141. That Defendants' refusal to pay Mr. Tsybikov the amount due and owed to him is vexatious, harassing, and in bad faith.

**Fraud in the inducement when transitioning to load-based payment**

142. Subsequent to hiring, approximately a year into Mr. Tsybikov's employment, Defendants Dovgal and Kim offered a change in the structure of compensation: that Mr. Tsybikov would be a lease-based driver and compensated on a percentage of a cost/pay derived from Defendant companies' customers based on freight/load confirmations.

143. During a conversation at DVL's head office in approximately July of 2015, Defendants Dovgal and Kim assured the Plaintiff that the freight confirmations would always be presented to Plaintiff and he would be compensated in full.

144. Defendant Dovgal also told Mr. Tsybikov (in Russian) during the same conversation at DVL's office in July of 2015 that "we don't tamper (or "doctor") with the freight confirmation and give honest freight confirmations to our drivers".

145. Defendants Dovgal and Kim withheld material information from Mr. Tsybikov that they personally or the personnel of Corporate Defendants, pursuant to direct orders by Dovgal and/or Kim, were consistently doctoring the freight confirmation or otherwise were presenting freight confirmations with the falsified rate figures to their then-employed truck drivers, and thus underpaying the drivers the compensation that they actually were earning.

146. Defendants Dovgal and Kim clearly and unequivocally intended that their statements of material facts to Mr. Tsybikov during their discussion of his transition to a load-based rate of pay in July of 2015 and withholding of material facts from him at the same time and place would induce Mr. Tsybikov to accept the change to his employment and induce him into continuing working for Defendant companies under the new rate and scheme of

compensation.

147.   Mr. Tsybikov did rely on false statements of material facts and withheld true of material facts by the two individual Defendants when he accepted Defendants' proposal to change to a load-based rate of pay.

148.   The damages of Mr. Tsybikov stem from his reliance on individual Defendants' false statements of material facts and withholding of material facts when he accepted the offer to change his rate of pay, and continued to work for Defendant companies. His actual damages sustained are in the amount of unpaid wages.

149.   That Defendants Dovgal and Kim had no legal basis to defraud Mr. Tsybikov and not pay him proper compensation he earned and was promised at the time of an offered change in the structure of his compensation.

150.   That any and all misrepresentations of material facts or otherwise fraudulent misrepresentations and concealments were committed by Defendants Dovgal and Kim on behalf of and for the benefit of Defendant companies, as well as to their own personal benefit.

151.   That Defendants' refusal to pay Mr. Tsybikov the amount due and owed to him is vexatious, harassing, and in bad faith.

**Punitive Damages**

152.   Defendants' refusal to pay Plaintiff the amount owed to him is vexatious, harassing, and in bad faith.

153.   That in addition to the amount of wages and/or final compensation the Defendants owe to Plaintiff and others similarly situated as a result of their willful failure to pay their owed wages and final compensation, Defendants are liable to Plaintiff and others similarly situated for all attorneys' fees and costs incurred as a result of this action.

154.   Plaintiff and others similarly situated are also entitled to punitive damages in an amount

to be determined by the trier of fact because:

155.     Defendants Dovgal and Kim knowingly and willfully made false statements of material fact to Plaintiff and withheld from him true statements of material fact, and did so on behalf of and for the benefit of Defendant company, with an intent to induce Plaintiff's reliance on individual Defendants' statements. The information individual Defendants withheld did induce Plaintiff to accept a job offer and work for Defendants in reliance on false statements, and later to change to a load-based rate of pay, to Plaintiff's detriment, as he was systematically underpaid throughout his employment. Defendants thus caused damages to Plaintiff.

## X. COUNT III: FRAUDULENT MISREPRESENTATION

156.     Plaintiffs re-allege and incorporate paragraphs 1 through 155 above as and for paragraph 156 of this Count III.

**Fraudulent misrepresentation at Plaintiff's hiring interview**

157.     Ayur Tsybikov interviewed with Defendant Dovgal over the phone in August of 2014 for the position of truck driver at Defendant companies.

158.     Defendant Dovgal made the following false statements of material fact and promises at individual Plaintiff Tsybikov's hiring interview in August of 2014:

   a.  That Defendants would pay Mr. Tsybikov's compensation in full and on time;

   b.  That Defendants were honest employers, and that Defendants paid all of their currently working drivers (as of August 2014) in full and on time.

159.     Defendant Dovgal knew these statements were false and that Mr. Tsybikov would not uncover this fraudulent scheme until after he would accept the employment offer and commence working. Particularly, Defendant Dovgal knew that in August of 2014, he was already underpaying his current drivers, and had no intention of treating Mr. Tsybikov any

35

differently.

160.    Defendant Dovgal also knew that he and Defendant Kim were planning to underpay Plaintiff for the duration of his employment, as they had already developed and implemented their unlawful scheme to falsify logbooks and apply chargebacks and other deductions to drivers' compensation.

161.    Defendant Dovgal clearly and unequivocally made misrepresentations of material facts to Plaintiff and withheld material facts from him in order to induce Plaintiff to accept the employment offer and begin working for Defendant companies.

162.    Defendant Dovgal intended to induce and did induce Plaintiff to act on his misrepresentations by inducing him to accept a position with Defendant companies. Plaintiff only accepted the position because he had been told that he would be paid in full, on time, with no deductions.

163.    Plaintiff reasonably and justifiably relied on Defendant Dovgal's misrepresentations. Defendant's false promises to pay timely and in full for Plaintiff's work performed sounded entirely plausible, as Plaintiff had no reason to believe that Defendants intended to break the law. Defendants' fraudulent scheme to withhold his earned compensation was not information of public record, and therefore Plaintiff could not have reasonably inquired and discovered that Defendant Dovgal was not telling him the truth and was concealing material facts from him. Furthermore, Plaintiff was a first-time truck driver, and had no reason to believe that any trucking company would underpay its employees and not pay what was promised and advertised.

164.    Had Plaintiff been aware of the fact that he would not be paid on time and the full compensation as agreed at hiring as Defendant Dovgal falsely affirmed, he would have acted differently and rejected the offer.

165.     Had Plaintiff been aware of the fact that Defendants would make improper and unlawful deductions from his earned compensation and falsified the logbooks for the miles he would drive based on which the compensation was to be determined, he would have acted differently and rejected the offer.

166.     The damages of Plaintiff stems from his entirely reasonable reliance on individual Defendant Dovgal's false statements of material facts and withholding of material facts when he accepted the job offer, commenced work, and continued to work for Defendant company. Plaintiff sustained actual damages due to his unpaid compensation, including unpaid miles driven, and unpaid loads hauled.

167.     Defendants Dovgal and Kim, neither personally nor for the benefit of Corporate Defendants, had no legal basis to defraud Plaintiff and not pay him proper compensation he earned and was promised at hiring.

168.     That any and all misrepresentations of material facts or otherwise fraudulent misrepresentations were made by Defendant Dovgal on behalf of and for the benefit of DVL and/or Altex Logistics, as well as for his and Defendant Kim's own personal benefit.

**Fraudulent misrepresentation when transitioning to load-based rate of pay**

169.   Subsequent to hiring, approximately a year into Mr. Tsybikov's employment, Defendants Dovgal and Kim offered a change in the structure of compensation: that Mr. Tsybikov would be a "lease"-based driver and compensated on a percentage of a cost/pay derived from customers based on freight/load confirmations.

170.   During a conversation at DVL's head office in approximately July of 2015, Defendants Dovgal and Kim assured the Plaintiff that the freight confirmations would always be presented to Plaintiff and he would be compensated in full.

171.   Defendant Dovgal also told Mr. Tsybikov (in Russian) during the same conversation at

DVL's office in July of 2015 that "we don't temper (or "doctor") with the freight confirmation and give honest freight confirmations to our drivers".

172.  Defendants Dovgal and Kim withheld material information from Mr. Tsybikov that they personally or the personnel of Corporate Defendants, pursuant to direct orders by Dovgal and/or Kim, were consistently doctoring the freight confirmation or otherwise were presenting freight confirmations with the falsified rate figures to their then-employed truck drivers, and thus underpaying the drivers the compensation that they actually were earning.

173.  Defendants Dovgal and Kim knew the statements they made to Plaintiff were false and that Mr. Tsybikov would not uncover this fraudulent scheme until after he had been induced to accept the change in employment and commenced working.

174.  Particularly, Defendants Dovgal and Kim knew that in July of 2015, the corporate Defendants Dovgal and Kim owned, controlled and managed, were already employing the drivers working on a load-based rate of pay and that at the order of Dovgal and Kim, Corporate Defendants' personnel were forging freight confirmations, and Dovgal and Kim had no intention of treating Mr. Tsybikov any differently.

175.  Defendants Dovgal and Kim also knew the statements they made were false, because at the time of their conversation with Plaintiff in July of 2015, the Corporate Defendants Dovgal and Kim owned and operated as executives, were already underpaying all of the load-based drivers working for them at the time. They also knew that they were planning to underpay and Plaintiff for the duration of his employment as a load-based driver, as they had already developed and implemented their unlawful scheme to forge freight/load confirmations.

176.  Defendants Dovgal and Kim clearly and unequivocally made misrepresentations of material facts to Plaintiff and withheld material facts from them in order to induce Plaintiff

to accept the changed rate of pay and continue working for Defendant companies.

177. Defendant Dovgal and Kim intended to induce (and did induce) Plaintiff to act on their misrepresentations by inducing him to accept the change in employment. Plaintiff only accepted the change in rate because he had been told that he would be paid in full, on time, with no deductions and that he freight confirmations are not "doctored" or tempered with.

178. Plaintiff reasonably and justifiably relied on Defendant Dovgal and Kim's misrepresentations. Defendants' false promises to pay timely and in full for Plaintiff's work performed sounded entirely plausible, as Plaintiff had no reason to believe that Defendants intended to break the law.

179. Had Plaintiff been aware of the fact that he would not be paid on time and in full and based on true freight confirmations as Defendants falsely affirmed, he would have acted differently and rejected the offer.

180. Had Plaintiff been aware of the fact that Defendants would make improper and unlawful deductions from his earned compensation and would pay him based on "doctored" or falsified freight confirmations, he would have acted differently and rejected the offer.

181. The damages of Plaintiff stems from his entirely reasonable reliance on individual Defendants Dovgal and Kim's false statements of material facts and withholding of material facts when he accepted the offer to change his rate of pay, commenced work, and continued to work for Defendant companies. Plaintiff sustained actual damages due to his unpaid compensation and unpaid loads hauled.

182. Defendants Dovgal and Kim had no legal basis to defraud Plaintiff and not pay him proper compensation he earned and was promised.

183. That any and all misrepresentations of material facts or otherwise fraudulent misrepresentations were made by Defendants Dovgal and Kim on behalf of and for the benefit

of DVL and/or Altex Logistics, as well as for their own personal benefit.

**Punitive Damages**

184.     That Defendants' refusal to pay Plaintiff the amount due and owed to them is vexatious, harassing, and in bad faith.

185.     That in addition to the amount of wages and/or final compensation the Defendants owe to Plaintiff as a result of their failure to pay his owed wages and final compensation, as well as attorneys' fees and costs incurred as a result of his action, Plaintiff is also entitled to punitive damages in an amount to be determined by the trier of fact because:

186.     Defendants Dovgal and Kim knowingly and willfully made false statements of material fact to Plaintiff and withheld from him true statements of material fact, and did so on behalf of and for the benefit of Defendant company, with an intent to induce Plaintiff's reliance on individual Defendants' statements. The information individual Defendants Dovgal and Kim withheld did induce Plaintiff to accept a job offer and work for Defendants in reliance on false statements, to Plaintiff's detriment, as he was underpaid systematically throughout his entire employment. Defendants thus caused damages to Plaintiff.

## XI. COUNT IV: FRAUDULENT CONCEALMENT

187.     Plaintiffs re-allege and incorporate paragraphs 1 through 186 above as and for paragraph 187 of this Count IV.

**Fraudulent concealment at Plaintiff's hiring interview**

188.     Ayur Tsybikov interviewed with Defendant Dovgal over the phone in August of 2014 for the position of truck driver at Defendant companies.

189.     Defendant Dovgal intentionally concealed and suppressed the following material facts at individual Plaintiff Tsybikov's hiring interview in August of 2014:

a. That Defendant companies would unlawfully treat Mr. Tsybikov as an independent contractor and not as an employee as Defendant Dovgal represented at hiring;

b. That Defendant companies would not pay Mr. Tsybikov in full and on time as Defendant Dovgal had promised at the time of hiring;

c. That Defendant companies would be deducting from Mr. Tsybikov's various chargebacks, fines, expenses.

d. That Defendant companies would be paying him for approximately 10% less miles than he would drive for Defendant companies, and that the Defendant companies would falsify or "doctor" the logbooks based on which the miles and corresponding compensation would be calculated and paid;

e. That Defendant Dovgal would consistently and repeatedly underpay Tsybikov his wages and compensation;

f. That at the time of the hiring interview, Defendant companies were already misclassifying and underpaying all of the then-employed truck drivers ; that the Defendant companies were falsifying or "doctoring" the logbooks based on which the compensation of the then-employed drivers was calculated and paid; that the Defendant companies were already systematically taking deductions from all of the then-employed drivers' compensation by charging back Defendant companies' costs, and imposing fines and penalties on the drivers for dubious violations.

190. At the time of founding of Dovgal's business, DVL Express and/or Dovgal Express d/b/a DVL Express, circa 2011, Defendants Dovgal and Kim developed a scheme to conceal material facts from truck drivers they would hire concerning the full and timely payment of their compensation contrary to what they would promise the drivers at hiring

191. At the time of Plaintiff's interview with Dovgal over the phone in August of 2014,

Defendants Dovgal and Kim developed a scheme to conceal material facts from Plaintiff concerning the full and timely payment of his compensation contrary to what they would promise him at hiring. Defendants Dovgal and Kim knew that Plaintiff would not uncover that these facts were concealed until after he had been induced to accept employment offer and commenced working.

192.    Defendants Dovgal intentionally concealed material facts from Plaintiff at hiring, which equally constitutes a fraudulent concealment of material facts. Defendant Dovgal clearly and unequivocally concealed statements of material facts from Plaintiff and withheld material facts from him in order to induce Plaintiff to accept the employment offer.

193.    Plaintiff could not have discovered the truth, concealed from him by Defendant Dovgal, through reasonable inquiry. Individual Defendants' fraudulent scheme to withhold Plaintiff's earned compensation was not information of public record, and therefore Plaintiff could not have reasonably inquired and discovered that Defendants were concealing material facts from him.

194.    Defendants, including Individual Defendants and Corporate Defendants' personnel at the instruction and direction of Individual Defendants, controlled the flow of information to Plaintiff regarding Corporate Defendants' employment and compensation policies. Therefore, Plaintiff could not have anticipated the fraudulent scheme devised by Individual Defendants and implemented by them and personnel of Corporate Defendants.

195.    Individual and Corporate Defendants had a duty to speak and not conceal material information because a fiduciary relationship arose between Defendants and Plaintiff at the hiring interview and existed throughout Plaintiff's time working as a truck driver for Defendant companies.

196.    The Corporate Defendants, and the Individual Defendants, as the officers and executives

of said companies, were also in a position of trust and influence vis-à-vis the Plaintiff at the moment he was interviewed, employment terms were communicated to him and a job offer was made.

197.    It was reasonable for Plaintiff to trust his interviewer to accurately describe the terms of employment, including pay, deductions, and classification as employees. It was also reasonable for Plaintiff to not expect Defendants to carry out an illegal scheme. Furthermore, Defendants' business expertise and sophistication was much more advanced than that of Plaintiff, and Defendants took advantage of Plaintiff's lack of English fluency, ability to consult an attorney, and inability to discovery the fraudulent concealment scheme as he was not yet working for the Defendant companies, to further deceive and take advantage of him.

198.    Such a position of trust, at which Defendant Dovgal has created the moment he began discussing the terms of prospective employment and rate of compensation and extending an offer to Plaintiff, dictated not only that the Defendant companies and Individual Defendants accurately, truthfully and expeditiously account for and pay Plaintiff all earned compensation, but also imposed onto them a duty to accurately communicate to Plaintiff his true rate of pay, working conditions, employee status, and all other information relevant to their employment, prior to implementing the scheme to defraud by falsifying logbooks, applying dubious deductions, and refusing to pay the promised rate of compensation in full and on time.

199.    Accordingly, the Defendant companies and Individual Defendants were in a position of trust with respect to Plaintiff and owed a fiduciary duty to him because Defendants exerted extraordinary control and influence over him as his de-facto and de-jure employers.

200.    Plaintiff justifiably relied on false statements of material facts made by the individual Defendants when he accepted Dovgal's offer of employment, and because of lack of knowledge of material facts that Defendant Dovgal conceled from him when he accepted a

job with Defendant companies.

201.   Had Plaintiff been aware of the fact that he would not be paid in full, for all miles he would drive, without deductions, chargebacks, fines and penalties, and on time, as Defendant Dovgal falsely affirmed, Mr. Tsybikov would have acted differently and rejected the offer.

202.   The damages of Plaintiff stem from his entirely reasonable reliance on individual Defendant Dovgal's false statements of material facts and due to Defendant Dovgal's concealment of material facts when he accepted the job offer, commenced work, and continued to work for Defendant companies. Plaintiff's damages were caused by Defendant companies' underpayment of his compensation, illicit deductions, and lack of payment for all miles driven as a result of payments made based on falsified or "doctored" logbooks.

203.   Defendants Dovgal and Kim had no legal basis to defraud Plaintiff and cause Corporate Defendants to not pay him proper compensation which he earned and was promised at hiring.

204.   The fraudulent concealment of material facts was committed by Defendant Dovgal on behalf of and for the benefit of Defendant companies, as well as for his and Defendant Kim's own personal benefit.

205.   The actual damages that Plaintiff sustained are in the amount of unpaid wages or compensation.

**Fraudulent concealment when transitioning to load-based rate of pay**

206.   Subsequent to hiring, around July of 2015, approximately a year into Mr. Tsybikov's employment, Defendants Dovgal and Kim offered a change in the structure of compensation: that Mr. Tsybikov would be a lease-based driver and compensated on a percentage of a cost/pay derived from customers based on freight confirmation.

207.   During their conversation at DVL's head office in approximately July of 2015, Defendants Dovgal and Kim intentionally concealed and suppressed the following material facts from

Plaintiff:

a.      That Defendant companies would not pay Mr. Tsybikov in full and on time as Defendants Dovgal and Kim had promised at the time of changing his employment terms in July of 2015;

b.      That Defendant companies would consistently and repeatedly underpay Tsybikov his wages and compensation;

c.      That Defendant companies' personnel, at the direction and instruction of Individual Defendants, would "doctor" or falsify the freight/load confirmations based on which Plaintiff's compensation would be determined and paid;

d.   That Defendant companies' personnel, at the direction and instruction of Individual Defendants, would apply various deductions to his compensation such as chargebacks of Defendant companies' expenses, fines and penalties for dubious violations;

e.   That Defendant companies were not paying their then-employed drivers in full and on time as Defendants Dovgal and Kim had represented they did;

f.   That Defendant companies were consistently and repeatedly underpaying their then-employed drivers their wages and compensation;

g.   That Defendant companies' personnel, at the direction and instruction of Individual Defendants, were "doctoring" or falsifying the freight/load confirmations based on which the Defendant companies were calculating and paying compensation to their then-employed drivers;

h.   That Defendant companies' personnel, at the direction and instruction of Individual Defendants, were systematically applying various deductions to the compensation of their then-employed drivers such as chargebacks of Defendant companies' expenses, fines and penalties for dubious violations.

208.     Defendants Dovgal and Kim intentionally concealed material facts from Plaintiff during their conversation about transitioning to load-based pay in July of 2015, which equally constitutes a fraudulent concealment of material facts. Defendants Dovgal and Kim clearly and unequivocally concealed statements of material facts from Plaintiff and withheld material facts from him in order to induce Plaintiff to accept the changed employment terms.

209.  Plaintiff could not have discovered the truth, concealed from him by Defendants, through reasonable inquiry. Until the conversation with Dovgal and Kim in July of 2015, Plaintiff drover as "company driver" and was compensated on a per mile basis and received or learned no account from other drivers any facts that he later learned and which Dovgal and Kim concealed from him in July of 2015.

210.  Defendants' fraudulent scheme to "doctor" or falsify freight/load confirmations, apply deductions from a "lease"-based driver's compensation by charging back Defendant companies' expenses, penalties and fines for dubious violations, as was already implemented to some of the then-employed drivers and as was to be implemented as to Plaintiff, tion was not information of public record; and therefore, Plaintiff could not have reasonably inquired and discovered that Defendants were concealing material facts from him.

211.  Individual Defendants and Corporate Defendants' personnel controlled the flow of information to Plaintiff regarding Corporate Defendants employment and compensation policies. Therefore, Plaintiff could not have anticipated the fraudulent scheme of concealment of material facts devised by Individual Defendants.

212.  Individual and Corporate Defendants had a duty to speak and not conceal material information because a fiduciary relationship arose between Defendants and Plaintiff during Individual Defendants' and Plaintiff's conversation in July of 2015 about changing the terms of his employment and existed throughout Plaintiff's time working as a truck driver for

Defendant companies.

213. The Corporate Defendants' personnel, and the Individual Defendants, as the officers and executives of said companies, were in a position of trust and influence vis-à-vis the Plaintiff. It was reasonable for Plaintiff to trust his superiors, the executives and managers of his employers, the Corporate Defendants, to accurately describe the terms of employment, including pay, deductions, freight/load confirmations schemes, employee status.

214. It was also reasonable for Plaintiff to not expect Defendants to carry out an illegal scheme. Furthermore, Individual Defendants' business expertise and sophistication was much more advanced than that of Plaintiff, and Individual Defendants took advantage of Plaintiff's lack of English fluency, inability to consult an attorney or, at the very least, other drivers similarly situated, to further deceive and take advantage of him.

215. Individual Defendants further exerted power over Plaintiff to force him to accept the new terms of his employment despite the concealed material facts when Defendant Dovgal told Plaintiff that if he, Plaintiff, does not sign the papers and accept the new basis for compensation, e.g. a percentage of a load based on freight confirmations, then he could no longer have a job at Defendant companies.

216. Such a position of trust dictated not only that the Corporate Defendants' personnel and Individual Defendants accurately, truthfully and expeditiously account for and pay Plaintiff all earned compensation, but also imposed onto them a duty to accurately communicate to Plaintiff his true rate of pay, working conditions, employee status, and all other information relevant to his employment, prior to modifying the terms of his employment.

217. Accordingly, the Defendant companies and Individual Defendants were in a position of trust with respect to Plaintiff and owed a fiduciary duty to him because Defendants exerted extraordinary control and influence over him as his de-facto and de-jure employers.

218. Plaintiff justifiably relied on false statements of material facts made by the individual Defendants when he accepted a modification of employment with Defendant company and he accepted such a modification because the Individual Defendants concealed material information from him.

219. Had Plaintiff been aware of the fact that he would not be paid in full for all his work and on time, and based on true freight confirmations, as Defendants falsely affirmed, he would have acted differently and rejected the modification of his employment terms.

220. The damages of Plaintiff stem from his entirely reasonable reliance on individual Defendants' false statements of material facts and concealment of material facts when he accepted the modification to his employment terms and continued to work for Defendant companies. Plaintiff's damages were caused by Defendants' underpayment of his compensation due to paying only based on "doctored" or falsified freight/loads confirmations, illicit deductions, and lack of payment for some of the loads hauled.

221. Defendants Dovgal and Kim had no legal basis to defraud Plaintiff and conceal material facts from him and cause Corporate Defendants to not pay him proper compensation which he earned and was promised at the conversation in July of 2015 in DVL office..

222. The fraudulent concealment of material facts was committed by Defendants Dovgal and Kim on behalf of and for the benefit of Defendant companies, as well as for their own personal benefit.

223. The actual damages that Plaintiff sustained are in the amount of unpaid wages or compensation.

**Punitive Damages**

224. The fraudulent concealment committed by Individual Defendants on their personal behalf and for the benefit of their respectively owned, operated and managed Corporate Defendants,

48

which resulted in the underpayment of Plaintiff's compensation that is due and owed to him, is vexatious, harassing, and in bad faith.

225. That in addition to the amount of unpaid wages and/or final compensation the Defendants owe to Plaintiff, as well as attorneys' fees and costs incurred as a result of this action, Plaintiff is also entitled to punitive damages in an amount to be determined by the trier of fact.

## XII. COUNT V: FRAUDULENT MISREPRESENTATION AS TO DEFENDANT COMPANIES ONLY, IN RELATION TO FREIGHT CONFIRMATIONS

226. Plaintiffs re-allege and incorporate paragraphs 1 through 225 above as and for paragraph 226 of this Count V.

227. During the second and third phases of Mr. Tsybikov's employment with Defendants- when he was paid on a per load basis- he was paid according to freight confirmations of the loads he would haul for the Defendant companies.

228. Mr. Tsybikov had a conversation with Defendant Dovgal in July of 2015, in which Defendant Dovgal suggested that he become a per-load employee instead of a per-mile employee, and assured him that he'd be paid in full for every load hauled, and that the freight confirmations provided would be accurate.

229. In repeated conversations from that point onwards, Defendant Dovgal assured Plaintiff that he would be paid according to accurate freight confirmations.

230. However, Mr. Tsybikov was not paid accurately, and was provided with "doctored" or false, forged freight confirmations. These confirmations would reflect a lower sum than what Mr. Tsybikov was owed in reality.

231. At one point, approximately a few months after driving as a "lease"-based driver compensated on a per load basis, Mr. Tsybikov became suspicious because the freight confirmations were much lower than he expected and than the ones he received at the

commencement of his employment under the modified terms in July of 2015.

232. He received a freight confirmation for $800, and called the broker directly to check; the broker informed him that the true freight confirmation was actually $1,000. This confirmed that Defendants were forging the freight confirmations in order to underpay Plaintiff. However, Defendants denied that their actions were fraudulent when Plaintiff confronted them.

233. Mr. Tsybikov after a few weeks therefrom, discovered similar incidents from fellow DVL Express and Altex Logistics drivers, who expressed nearly identical concerns of confronting Defendants with forged freight confirmations per various brokers.242.      At least 200 times throughout the course of Mr. Tsybikov's employment, he was paid according to fraudulent freight confirmations. Every separate fictitious freight confirmation was an instance of fraudulent misrepresentation. This 200 figure is based on Mr. Tsybikov's estimation of how many loads, typically, based on his records at hand, Mr. Tsybikov would haul per week or per month during his employment with Corporate Defendants between July 2015 and August of 2017.

234. Corporate Defendants' personnel, under the control of, and pursuant to orders by,Defendants Dovgal and Kim, or the Individual Defendants themselves, have forged freight confirmations in order to pay Plaintiff and other similarly situated drivers working for Corporate Defendants less than they were due and earned.

235. Individual Defendants and other personnel of Corporate Defendants who were involved in this illegal scheme, knew these forgeries constituted fraudulent conduct, as they would have had to change the true amounts of a price per load obtained from a broker as paid by Defendant companies' customers to the Defendant companies, in order   to reflect a lower dollar amount and consequently, reduce the compensation to drivers that was otherwise due to them, as promised, and as the drivers relied on.

236.     Defendants intended to induce (and did induce) Plaintiff and other similarly situated drivers to act upon Individual and Corporate Defendants' misrepresentations by accepting the lower payments than they were owed.

237.     Plaintiff and other similarly situated drivers reasonably and justifiably relied on Defendants' misrepresentations. The freight confirmations Plaintiff and other similarly situated drivers received seemed entirely plausible, as Plaintiff and other drivers had no reason to believe that Defendants intended to break the law. Defendants' fraudulent scheme to forge the freight/load confirmations as to withhold the drivers' earned compensation was not information of public record; and therefore, Plaintiff and other similarly situated drivers could not have reasonably inquired and discovered that Defendants were forging the very documents based on which the compensation was calculated and paid.

238.     Even once Mr. Tsybikov discovered, through one of the brokers he spoke with a few months into the July 2018 modification to his employment terms, that he had been given a forged confirmation, he justifiably relied on Defendant Dovgal's and Defendants DVL' and Altex' dispatcher's claims that the broker "was lying or confused", and that the freight confirmation Mr. Tsybikov been given was accurate.

239.     Corporate Defendants were Plaintiff's employers, just like they were the employers of other similarly situated drivers working and hauling loads for DVL and Altex, and Plaintiff and other similarly situated drivers reasonably trusted Individual Defendants and Corporate Defendants' personnel to pay them fairly and accurately.

240.     Had Plaintiff been aware that Defendants would pay him according to fraudulent freight confirmations, he would have refused to accept the lower payments. Plaintiff pleads that other similarly situated drivers would have refused to accept lower payments if they were told by Defendants about the forged or "doctored" freight/load confirmations.

241. Plaintiff's and other similarly situated drivers' damages stem from Plaintiff's and other similarly situated drivers' entirely reasonable reliance on the freight confirmation Corporate Defendants' personnel presented to them, while all along these freight confirmations were "doctored", or forged and thus fraudulent.

242. Defendants had no legal basis to forge freight confirmations and pay Plaintiff and other similarly situated drivers based on such forged, fraudulent freight/load confirmations.

243. The exact amount of such forged freight confirmations, the dates for when they were forged, who, at DVL and Altex, specifically forged them, and who and when subsequently presented such forged confirmation to Plaintiffs and other similarly situated drivers, as well as the actual amount of damages sustained, can only be determined through the Action for Accounting, and/or discovery in this matter.

**Punitive Damages**

244. That Defendants' forging or "doctoring" freight confirmations as to intentionally and knowingly refuse to pay Plaintiff and others similarly situated the amount due and owed to them as they have earned through hard work, was vexatious, harassing, and in bad faith, meant to increase Corporate and Individual Defendants' profit margin at any cost, and on belief that the drivers, due to most of them being recent immigrants in the United States and unsophisticated about the legal system and laws prohibiting such conduct, would not discovery such vast and unimaginable abuses of power and would not complaint to any authorities or seek an action in court.

245. That in addition to the amount of wages and/or final compensation the Defendants owe to Plaintiff and other similarly situated drivers as a result of such a gross fraudulent conduct by all Defendants, all Defendants must be liable for all attorneys' fees and costs incurred as a result of this action, and for punitive damages in an amount to be determined by the trier of fact

because:

246.     Individual Defendants and Corporate Defendants' personnel at the order and instruction of Individual Defendants knowingly and willfully forged or "doctored" the documents based on which the compensation of drivers was calculated and paid, and thus made false statements of material fact to Plaintiff and other similarly situated drivers, and concealed from them material facts. Individual Defendants did so on behalf of and for the benefit of Defendant companies and their own personal gain, with an intent to induce Plaintiff's and other similarly situated drivers' reliance on presented forged freight confirmation as to continue working for Corporate Defendants.

## XIII. COUNT VI: CIVIL CONSPIRACY

247.   Plaintiff re-alleges and incorporates paragraphs 1 through 246 above as and for paragraph 247 of this Count IV.

248.   At the time when Defendants Dovgal and Kim incorporated and set up DVL Express in 2011, these two individual Defendants entered into an agreement with each other to defraud the truck drivers they were to hire, misclassify them as independent contractors as opposed to employees as to further violate various provisions of the IWPCA by taking unlawful deductions of chargebacks of expenses, fines and penalties. They further developed their agreement in the following years as to forge or "doctor" logbooks and freight confirmations based on which the drivers' compensation would be calculated and paid

249.   Individual Defendants knew that they would represent false statements of material fact to Plaintiff and others similarly situated and conceal material facts from them in order to induce them to accept employment offers with Defendant companies.

250.   Individual Defendants also knew that to implement and further their scheme to defraud and to violate IWPCA, as well as multiple other laws and regulations, both state and federal, they

would need to have an agreement to perpetrate the fraud and implement the misclassification and underpayment schemes, and to act in concert to ensure that all Corporate Defendants and their agents and employees comply with their fraudulent intent.

251. Individual Defendants developed a scheme to misclassify the truck drivers as independent contractors, to withhold the compensation from truck drivers, to not pay them in a timely manner, and not pay them final compensation and all wages that they would earn. In short, they conspired to set up a scheme to violate Section 2 of IWPCA by misclassifying their employees-truck drivers as independent contractors and then multiple provisions of IWPCA.

252. Individual Defendants knew that they had no right under the IWPCA to withhold wages Plaintiff and others similarly situated drivers earned.

253. By their actions, Defendants caused and continue to cause injury to Plaintiff and others similarly situated by way of unpaid wages, unpaid final compensation, untimely and delayed payment of wages, by not paying payroll tax, unemployment insurance, workers compensation, and other like contributions on behalf of Plaintiff and others similarly situated to relevant state and federal agencies.

254. Individual Defendants committed overt acts in furtherance of the common scheme by advertising job positions with Corporate Defendants, interviewing Plaintiff and others similarly situated, making false statements of material facts and withholding true material facts, by offering them jobs and hiring them but then misclassifying them as independent contractors, by not paying them wages earned and final compensation, by forging documents or directing Corporate Defendants' personnel to forge the documents, such as logbooks and freight/load confirmations, based on which the reduced compensation was calculated and paid..

255. Individual Defendants committed civil conspiracy against Plaintiff and others similarly

situated. Namely, to commit IWPCA violations, and to commit common law fraud in Illinois. The actions of Individual Defendants and the conduct constituting civil conspiracy are imputed to Defendant companies that each individual Defendant respectively owns, controls, directs and operates.

256. Defendants' conspiracy against Plaintiff and others similarly situated is vexatious, harassing, and in bad faith.

257. That in addition to the amount of wages and/or final compensation the Defendants owe Plaintiff and others similarly situated drivers as a result of their conspiracy to defraud them and violate IWPCA, and attorneys' fees and costs incurred as a result of this action, Plaintiffs and others similarly situated drivers are also entitled to punitive damages because:

258. Individual Defendants have knowingly and willfully committed conspiracy to defraud Plaintiff and others similarly situated drivers and to violate their rights under IWPCA;

259. The commission of civil conspiracy in Illinois is an intentional tort, and also is a violation of Illinois Wage Payment and Collection Act, whereby the knowingly and willingly committed violation of that Act also constitutes a criminal violation of the laws of this state (820 ILCS 115/14); and

260. Individual Defendants' civil conspiracy was and is a deliberate attempt to lure Plaintiff and other similarly situated drivers into working for Defendant companies without due compensation for their service, as well as annoy, harass, oppress, and intimate Plaintiff and others similarly situated - who do not have the financial and legal resources that the Defendants have at their disposal - into abandoning a legal right which Plaintiff and others similarly situated properly asserted (*i.e.* to be paid the compensation by their employer which, by all accounts, they have earned and which is due and owing pursuant to the Illinois Wage Payment and Collection Act).

## XIV. COUNT VII
## DECLARATORY JUDGMENT

261. Plaintiff re-alleges and incorporates paragraphs 1 through 260 above as and for paragraph 261 of this Count VII.

262. Mr. Tsybikov and the class members have substantial legal interests in being properly classified as employees under IWPCA, in the earned compensation on a per mile basis and/or on a percentage of a freight/load confirmation basis or tasks performed, "wages" and/or "final compensation" improperly withheld by Defendants, and to which the Corporate Defendants, at the direction and order of Individual Defendants Dovgal and Kim have failed or refused to pay, and therefore, in the outcome of the Court's decision as to the legality of Defendants' conduct.

263. There are currently members of the putative class who remain employed by the Defendant companies or otherwise continue working for Defendant companies as truck drivers hauling the loads or freight for Defendant companies under the Defendant companies' DOT Motor Carrier authority, and are directly and adversely affected by Defendants' wrongful policies of misclassifying drivers as independent contractors and ongoing violations of agreements to compensate the said truck drivers for all work they perform. Plaintiffs who are current employees continue to work without being compensated for all work they perform as company drivers and continue to be subjected to unlawful deductions from their earned compensation.

264. Mr. Tsybikov and the class members have a tangible legal interest in the cessation of Defendants' unlawful misclassification of drivers as independent contractors, because Defendant companies continue to owe and withhold from their paychecks the unpaid "wages" or "final compensation", which the Plaintiff and class members have rightfully earned and are entitled to.

265. Alternatively, the drivers who currently work for Defendant companies and meet the

class definition and/or potential sub-class definitions, have a tangible legal interest in the cessation of Defendants' unlawful misclassification of drivers as independent contractors, because Defendant companies continue to owe and withhold from their paychecks the unpaid "wages" or "final compensation", which the these putative class members have rightfully earned and are entitled to.

266.   The named Plaintiff and class members have the common interest of determining whether Defendants are liable for money damages and entitled to equitable remedies to the proposed class of Defendants' truck drivers for violations of their rights under IWPCA and Illinois Common Law. The named Plaintiff is not subject to any unique defenses that may be asserted against him which render the putative class members-current employees' claims as atypical of other Class members.

267.   Defendants have interests adverse to Mr. Tsybikov and the class members, particularly the current employees, in that by unlawfully misclassifying them as independent contractors and improperly withholding earned compensation, "wages" and/or "final compensation", and by failing and refusing to pay said earned compensation, "wages" and/or "final compensation", Defendants benefited and continue to benefit at their drivers' expense.

268.   An actual case or controversy exists between Mr. Tsybikov and the class members on one side and the Defendants on the other due to the fact that, as alleged, Defendants have unlawfully misclassified their drivers as independent contractors and then improperly withheld earned compensation, "wages" and/or "final compensation".

269.   An actual case or controversy exists between Mr. Tsybikov and the class members on one side and the Defendants on another, due to the fact that, as alleged, Defendants continued to misclassify the existing employees and the new-hires and improperly withhold earned compensation, "wages" and/or "final compensation" from the pay of the employees presently

working for the Defendants while the violations of IWPCA are ongoing.

270.   Mr. Tsybikov is the only one, so far, who can seek declaratory judgment on behalf of the current employees because no current employee is likely to come forward and bring declaratory judgment action for the fear of retaliation by Corporate and Individual Defendants.

271.   Defendants must be ordered to cease the misclassification and must be ordered to account for all current and former employees' improperly withheld compensation, "wages" and/or "final compensation."

272.   Defendants should be enjoined from dispersing said improperly withheld funds and said funds should be placed in a constructive trust until further order of the Court.

273.   The Court can resolve this dispute by declaring the parties' rights and obligations under Illinois law, *e.g.*, Mr. Tsybikov and the class members may request that the Court declare the Defendants' practice and policy of misclassifying their employees as independent contractors, and consequently, refusing to pay their current and terminated employees (voluntary or involuntary) their earned compensation, "wages" and/or "final compensation" a null and void forfeiture; that the Court declare the rights of the parties pursuant to the IWCPA, 820 ILCS §115/; declare that the Defendants' retention of their current and terminated employees' (voluntary or involuntary) earned compensation is a windfall which unjustly enriches the Defendants to the damage and detriment of the Plaintiff and the class members; and declare that the Defendants' practice of deeming earned-in-fact compensation unearned, merely because Defendants' incurred expenses as a result of Plaintiff's and the putative class members' performing their assigned tasks, violates the Illinois Wage Payment and Collection Act, and unjustly enriches the Defendants to the damage and detriment of Mr. Tsybikov and the class members.

## XV. COUNT VIII

## **ACCOUNTING**

274. Plaintiff re-alleges and incorporates paragraphs 1 through 273 above and as and for paragraph 274 of this Count VIII.

275. Pursuant to the above-described claims and causes of action, the circumstances or relationship between the parties gave rise to a duty on the part of the Defendants to account to Mr. Tsybikov and the class members.

276. Fiduciary relationship existed between the Defendant companies and Mr. Tsybikov, as well as between Defendant companies and putative class members, and such a fiduciary relationship continues to exist between Defendant companies and its currently employed drivers because the corporate Defendants, being the employers of their drivers and the Individual Defendants as the officers or executives of the Defendant employers, were and are in a position of trust vis-à-vis its employees. Such a position of trust dictated that the Defendant companies and Individual Defendants accurately, truthfully and expeditiously account for and pay Mr. Tsybikov and the class members all earned compensation improperly withheld by Defendants, and account for all documentary records based on which such compensation was paid or was to be paid.

277. The Defendant companies and Individual Defendants were and are in a position of trust with respect to Mr. Tsybikov and the class members and owe a fiduciary duty to them because Defendants Dovgal and Kim exerted extraordinary control and influence over the them, personally and on behalf of respectively owned and managed Corporate Defendants, as their drivers' de-facto and de-jure employers.

278. Special circumstances also exist which establish a fiduciary duty, owed by the Defendants to Mr. Tsybikov and the class members, as they, for the most part, lack sophisticated education and experience. Defendants Dovgal and Kim knew that Mr. Tsybikov and most of the class

members lack the requisite English language skills and had otherwise experienced language barriers and bargaining power in communicating with Individual Defendants and Defendant companies' personnel, including about the compensation for the performance of required tasks.

279. Defendants Dovgal and Kim had superior knowledge and understanding that Mr. Tsybikov and the class members would not have because they lacked and lack the resources to defer to legal advisors or translators during the hiring process and thereafter as to review and understand the legal paperwork the Defendants required to be executed. The Plaintiff and putative class members had a great level of deference and trust towards Defendants because of their lack of sophisticated education, experience, and requisite language and communication skills.

280. Mr. Tsybikov, and the class members provided personal services to the Defendants with the common understanding that they would receive compensation in full.

281. There is a need for discovery through accounting because the amount of compensation on a per mile basis cannot be determined since the Corporate Defendants, as alleged herein, forged or "doctored" the logbooks, based on which compensation on a per mile basis was paid. Similarly, since the freight/load confirmations, as alleged herein, were forged or "doctored", there is a need for accounting.

282. There is also a need for discovery through accounting because the amount of compensation to which Mr. Tsybikov and the class members are entitled and which they have earned cannot be presently known, because all books of accounts and records pertaining to the dispute are in the possession and control of the Corporate and Individual Defendants, and based thereon Mr. Tsybikov and the class members need an accounting to ascertain the damages they are entitled to recover.

283. Accordingly, an accounting would permit Mr. Tsybikov and the class members (and the Court) to ascertain the amounts due to them.

284. Mr. Tsybikov and the class members demanded that the Defendants and their management account for and pay all of their earned compensation and that truthful and not forged freight confirmations are presented to them and the Defendants had refused to present the truthful accounts and freight confirmation and to pay the actually earned compensation.

285. An accounting should be conducted in equity for the following reasons:

286. The need for an accounting has arisen from the above-described fiduciary relationship between the parties;

287. There is a need for accounting supervised by this Court, because it would involve intricate itemizations of earned compensation as damages awards and interest, and

288. There is a need for discovery.

## XVI. COUNT IX
## UNJUST ENRICHMENT (pleaded in an alternative to Count I)

289. Plaintiff re-alleges and incorporates paragraphs 1 through 288 above, as and for paragraph 289 of this Count IX. Count IX is pleaded in an alternative to Count I.

290. Defendants received revenue and benefits by and through the efforts of Mr. Tsybikov and the class members and improperly withheld their earned to their detriment, all in violation of fundamental justice, equity and good conscience.

291. Mr. Tsybikov and the class members have conferred a benefit on Defendants through their service of driving as interstate truck drivers hauling loads and cargo for Defendants' benefit and to their detriment because of Defendants' practices and policies of underpaying their drivers and because of Defendants' failure and refusal to pay Plaintiff and the putative class members their earned compensation for their services.

292. Individual and Corporate Defendants have knowledge of these benefits conferred upon

them, all defendants have accepted and retained these benefits conferred on them, and all defendants refused to return such benefits conferred upon them despite the requests by Plaintiffs and other similarly situated drivers.

293. Defendants will be unjustly enriched if they are allowed to retain the improperly withheld earned compensation of their current and former employees.

294. Defendants will be unjustly enriched if they are allowed to retain their self-imposed forfeiture of the withheld employees' compensation.

295. This Count IX is pleaded in an alternative to Count I.

## XVII. **<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff prays that this Honorable Court:

a. Certifies the class and appoint Plaintiff and Plaintiff's counsel to represent the class;

b. Finds that the Corporate Defendants violated the Illinois Wage Payment and Collection Act, 820 ILCS § 115/1, § 115/2, § 115/3, § 115/4, § 115/5, § 115/9, § 115/10, and § 115/14 and that Individual Defendants are personally jointly and severally liable for the Corporate Defendants' violations of IWPCA under Section 13 of the IWPCA;

c. Finds that Individual and Corporate Defendants committed common law fraud against Plaintiff and others similarly situated such as fraud in inducement (or promissory fraud), fraudulent misrepresentation and fraudulent concealment;

d. Finds that Defendants Dovgal and Kim entered into a conspiracy to commit violations of the IWPCA and to commit common law fraud, for their own personal benefit and for the benefit of respectfully managed principal Corporate Defendants;

e. Declares the rights of the parties, as alleged herein through declaratory judgment;

f. Finds that the Defendants must account for all current and former employees' improperly withheld compensation and for all documentary records based on which the compensation was

paid or was to be paid, as alleged herein, that the Defendants should be enjoined from dispersing said funds; and that the said funds should be placed into a constructive trust until further order of Court;

g. Finds that the Individual and Corporate Defendants have been unjustly enriched by their practices and policies of not paying earned compensation to their drivers and thus retained the benefit conferred upon them by Plaintiff and other similarly situated drivers-putative class members, and orders Defendants to pay restitution to Plaintiff and putative class members in the amount of unpaid compensation, in the event that this Court denies the claims under Count I. Finds that the Defendants must pay all earned compensation with interest thereon, including statutory interest under Section 14 of IWPCA, and any other statutory prejudgment interest;

h. Requires that the Defendants must pay punitive damage for their willful and wanton conduct as alleged herein;

j. Awards statutory attorneys' fees and costs pursuant to 820 ILCS § 115/14(a) or pursuant to a judgment on Common Law causes of action of fraudulent inducement, fraudulent concealment, fraudulent misrepresentation and civil conspiracy, as well as punitive damages, and

i. Grants such other relief as this Court deems appropriate.

Respectfully submitted,
By: /s/ Julia Bikbova
Julia Bikbova, Plaintiff's Attorney

Bikbova Law Offices, P.C.
Julia Bikbova
Attorney for Plaintiff
666 Dundee Rd, Suite 1604
Northbrook, IL 60062
Ph: 847-730-1800
julia@bikbovalaw.com
ARDC 6291400