## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| AYUR TSYBIKOV, | ) |
| ALEH LINIOU | ) |
|     Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action 19-cv-03334 |
| | ) |
| OLEKSANDR DOVGAL, | ) |
| ALINA KIM, | ) |
| DVL EXPRESS INC, | ) |
| ALTEX LOGISTICS INC | ) |
|     Defendants. | ) |

## FIRST AMENDED CLASS ACTION COMPLAINT


Julia Bikbova
Bikbova Law Offices, P.C.
666 Dundee Road, Suite 1604
Northbrook, IL 60062
(847) 730-1800
julia@bikbovalaw.com
ARDC 6291400

*Attorney for Plaintiffs*

1

I.      NATURE OF THE CASE……………………………………………...………..3

II.     PARTIES………………………………………………………………………..4

III.    JURISDICTION AND VENUE…………………………………………………6

IV.     RELEVANT STATUTES AND REGULATIONS……………………………...7

V.      PROCEDURAL HISTORY……………………………………………………...9

VI.     STATEMENT OF FACTS…………………………………………...………10

VII.    CLASS ALLEGATIONS…………………………………………………27

VIII.   COUNT I…………………………………………………………..……......34

IX.     COUNT II…………………………………………………………..……..36

X.      PRAYER FOR RELIEF…………………………………………………...39

Plaintiffs Ayur Tsybikov and Aleh Liniou, individually and on behalf of all other similarly situated current and former employees of Defendant companies DVL Express, Inc. ('DVL') and Altex Logistics, Inc. ('Altex'), by their attorney, Julia Bikbova of Bikbova Law Offices, P.C., bring their claims as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, The Illinois Wage Payment and Collection Act, ("IWPCA"), 820 ILCS § 115/2, § 115/3, § 115/4, § 115/5, § 115/9, § 115/10, § 115/13 and § 115/14 and Illinois common law against DVL and Altex, (collectively referred to as "Corporate Defendants" or "Defendant companies"), Oleksandr Dovgal and Alina Kim ("Individual Defendants"), and alleges, based upon investigations made by their counsel, as follows:

## I.    NATURE OF THE CASE

1. Plaintiff Ayur Tsybikov worked as a truck driver for Defendant Companies DVL and Altex Logistics, which are owned and operated by Oleksandr Dovgal and Alina Kim. Throughout his employment, he was misclassified as an independent contractor, and consistently underpaid. Defendants made deductions from Ayur Tsybikov's paychecks, which he did not consent to and was not alerted to beforehand. Defendants also forged or "doctored" the logbooks and freight/load confirmations based on which the Plaintiff's compensation was calculated and paid, resulting in underpayment of wages he actually earned.

2. Plaintiff Aleh Liniou worked as a truck driver for Defendant Companies DVL and Altex Logistics, which are owned and operated by Oleksandr Dovgal and Alina Kim. Throughout his employment, he was misclassified as an independent contractor. Defendants made deductions from Aleh Liniou's paychecks, which he did not consent to and was not alerted to beforehand. By doing so, Defendant Companies and the Individual Defendants, who controlled them and directed their policies of

3

misclassification of drivers and deductions, violated multiple provisions of the Illinois

Wage Payment and Collection Act, 820 ILCS § 115/.

3. Similarly, Defendant Companies and Individual Defendants committed common law

violations- namely, civil conspiracy to commit IWPCA violations.

4. Plaintiffs bring this action on a class basis as to all causes of action and bases for relief,

on behalf of all similarly situated drivers who worked or work at Defendant Companies

or any related (sister, parent, subsidiary) companies. The violations experienced by Mr.

Tsybikov and Mr. Liniou were not discrete occurrences, but constituted a business

model for DVL and Altex. The vast majority (if not all) of the truck drivers who worked

or work for said companies were or are misclassified, underpaid, and subjected to illicit

deductions.

## II.    PARTIES

5. Plaintiff Ayur Tsybikov is a resident of Illinois and worked as a truck driver in Illinois,

compensated on a per mile basis and later on as a per hauled cargo load basis as a non-

exempt employee for Defendant companies in the state of Illinois, during the applicable

statute of limitations period, and at all relevant times was a full time Illinois employee

within the meaning of the IWPCA, 820 ILCS § 115/2.

6. Plaintiff Aleh Liniou works as a truck driver in Illinois, compensated on a per mile basis,

as a non-exempt employee for Defendant companies in the state of Illinois, during the

applicable statute of limitations period, and at all relevant times was and is a full time

Illinois employee within the meaning of the IWPCA, 820 ILCS § 115/2.

7. Plaintiffs bring this case on behalf of themselves and others who currently work, and

who previously worked as drivers for Defendants at any time during the relevant statute

of limitations preceding the filing of the original complaint (hereinafter "Violation

Period").

8.  At all relevant times hereto, Defendant DVL Express Inc. has been an Illinois corporation engaged in transportation and delivery business in Illinois and throughout the United States. DVL conducts business in Illinois and operates facilities in Illinois. Its principal place of business is 2064 W. 167th Str, Markham, IL 60428. Defendant DVL Express has at all relevant times been an "employer" of Plaintiffs and other similarly situated truck drivers of Defendant companies within the meaning of the IWPCA, 820 ILCS § 115/2.

9.  Defendant Oleksandr Dovgal is a resident of the State of Illinois, and on information and belief, is the sole shareholder of DVL and has been its incorporator, founder, registered agent, President, and officer from its inception through to the present day. Defendant Dovgal was and is DVL's key decision maker and its actual executive, who has had and exercised key decision powers with respect to payment of compensation to truck drivers working for the defendant companies, the misclassification of drivers as independent contractors, and deductions made from drivers' compensation. Defendant Dovgal caused or otherwise knowingly permitted DVL to violate provisions of the IWPCA. As such, at all relevant times Defendant Dovgal has been an "employer" of Plaintiffs within the meaning of the IWPCA, 820 ILCS § 115/13.

10. At all relevant times hereto, Defendant Altex Logistics has been an Illinois corporation engaged in transportation and delivery business in Illinois and throughout the United States. Its principal place of business is 2064 W. 167th Str, Markham, IL 60428. Altex Logistics conducts business in Illinois and operates facilities in Illinois. Altex Logistics has at all relevant times been an "employer" of Plaintiffs and other similarly situated employees of Defendant companies within the meaning of the IWPCA, 820 ILCS §

115/2.

11. Defendant Alina Kim is a resident of State of Illinois, and on information and belief, is the sole shareholder of Altex Logistics and has been its incorporator, founder, registered agent, President, and officer from its inception through to the present day, as well as the key decision maker as to compensation of the drivers and its actual executive. Defendant Kim was and is Altex Logistics' key decision maker and its actual executive, who has had and exercised key decision powers with respect to payment of compensation to truck drivers working for the defendant companies, the misclassification of drivers as independent contractors, and deductions made from drivers' compensation. Defendant Kim caused or otherwise knowingly permitted Altex Logistics to violate provisions of the IWPCA. As such, at all relevant times Defendant Kim has been an "employer" of Plaintiffs within the meaning of the IWPCA, 820 ILCS § 115/13.

12. Defendant Oleksandr Dovgal was and is DVL's and Altex Logistics' key decision maker and its actual executive, who has had and exercised key decision powers with respect to payment of compensation to truck drivers working for either or both defendant companies, the misclassification of drivers as independent contractors, and deductions made from drivers' compensation. Defendant Dovgal caused or otherwise knowingly permitted DVL and Altex Logistics to violate provisions of the IWPCA. As such, at all relevant times Defendant Dovgal has been an "employer" of Plaintiff within the meaning of the IWPCA, 820 ILCS § 115/13.

### III.    JURISDICTION AND VENUE

13. This court has personal jurisdiction over Plaintiffs and the class they seek to represent because putative class members are citizens of the State of Illinois and/or work or

worked in the State of Illinois, including this judicial district, for the Defendant companies.

14. This Court has personal jurisdiction over Defendants because the Defendants do business in the State of Illinois, including this judicial district, and their conduct in the State of Illinois, including this judicial district, underlies all claims in this suit. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2) as this matter is a civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which some members of a class of plaintiffs are citizens of a State different from any defendant.

15. Venue is proper in this District pursuant to 28 U.S.C§ 1391(b)(2) because a substantial part of the events or omissions which gave rise to IWPCA violations occurred in the Northern District of Illinois.

## IV. RELEVANT STATUTES AND REGULATIONS

16. The Illinois Wage Payment and Collection Act ((820 ILCS 115/) protects Illinois workers from misclassification, underpayment of wages and compensation, unauthorized deductions, and untimely payment of earned compensation. Just as other Illinois wage laws, the IWPCA is a public interest law.

17. Under Section 2 of the IWPCA, "For all employees, other than separated employees, "wages" shall be defined as any compensation owed an employee by an employer pursuant to an employment contract or agreement between the 2 parties, whether the amount is determined on a time, task, piece, or any other basis of calculation." 820 ILCS 115/2.

18. Under Section 3 of the IWPCA, "Every employer shall be required, at least semi-

7

monthly, to pay every employee all wages earned during the semi-monthly pay period." 820 ILCS 115/3.

19. Under Section 4 of the IWPCA, "All wages earned by any employee during a semi-monthly or bi-weekly pay period shall be paid to such employee not later than 13 days after the end of the pay period in which such wages were earned. All wages earned by any employee during a weekly pay period shall be paid not later than 7 days after the end of the weekly pay period in which the wages were earned. All wages paid on a daily basis shall be paid insofar as possible on the same day as the wages were earned, or not later in any event than 24 hours after the day on which the wages were earned." 820 ILCS 115/4.

20. Under Section 5 of the IWPCA, "Every employer shall pay the final compensation of separated employees in full, at the time of separation, if possible, but in no case later than the next regularly scheduled payday for such employee." 820 ILCS 115/5.

21. Under Section 9 of the IWPCA, "Except as hereinafter provided, deductions by employers from wages or final compensation are prohibited unless such deductions are (1) required by law; (2) to the benefit of the employee; (3) in response to a valid wage assignment or wage deduction order; (4) made with the express written consent of the employee, given freely at the time the deduction is made; (5) made by a municipality with a population of 500,000 or more . . . or (6) made by a housing authority in a municipality with a population of 500,000 or more…" 820 ILCS 115/9.

22. Under Section 9.5 of the IWPCA, "An employer shall reimburse an employee for all necessary expenditures or losses incurred by the employee within the employee's scope of employment and directly related to services performed for the employer. As used in this Section, "necessary expenditures" means all reasonable expenditures or losses

8

required of the employee in the discharge of employment duties and that inure to the primary benefit of the employer."

23. Under Section 10 of the IWPCA, "Employers shall notify employees, at the time of hiring, of the rate of pay and of the time and place of payment. Whenever possible, such notification shall be in writing and shall be acknowledged by both parties. Employers shall also notify employees of any changes in the arrangements, specified above, prior to the time of change." 820 ILCS 115/10.

24. Under Section 13 of the IWPCA, "In addition to an individual who is deemed to be an employer pursuant to Section 2 of this Act, any officers of a corporation or agents of an employer who knowingly permit such employer to violate the provisions of this Act shall be deemed to be the employers of the employees of the corporation." 820 ILCS 115/13.

25. Under Section 14(a) of the IWPCA, "Any employee not timely paid wages, final compensation, or wage supplements by his or her employer as required by this Act shall be entitled to recover through a claim filed with the Department of Labor or in a civil action, but not both, the amount of any such underpayments and damages of 2% of the amount of any such underpayments for each month following the date of payment during which such underpayments remain unpaid. In a civil action, such employee shall also recover costs and all reasonable attorney's fees. 820 ILCS 115/14.

### V. PROCEDURAL HISTORY

26. The instant matter was instituted via a Class Action Complaint, filed by Plaintiff Tsybikov in the Circuit Court of Cook County, Illinois, Chancery Division, on February 13, 2019 under Civil Action No. 2019-CH-01814. The Complaint alleged seven causes of action, with counts for violations of the IWPCA, common law fraud, civil conspiracy, accounting, and unjust enrichment.

27. On February 14, 2019, Plaintiff filed (lodged) a Motion for Class Certification Pursuant to Rule 5/2-801 of the Illinois Code of Civil Procedure.

28. On April 4, 2019, Plaintiff filed a Motion for Default Judgment.

29. On May 9, 2019, Defendants filed a Motion to Quash Service of Process of Plaintiff's Complaint.

30. On May 17, 2019, Defendants filed a Notice of Removal to this Court and removed this case pursuant to the Federal Class Action Fairness Act, 28 U.S.C. § 1446 and 1453. Plaintiff Tsybikov conceded to jurisdiction of this Court and filed an Amended Complaint to conform it to the rules of this federal district Court, but without any substantive changes.

31. On August 22, 2019, Defendants filed their Motion to Dismiss Plaintiff's Amended Class Action Complaint pursuant to Fed. R. Civ. P. 12(b)(6).

32. After the review of the fully briefed Motion to Dismiss, on October 16, 2019, this Court granted Defendants' Motion to Dismiss in part, dismissing Plaintiff's claims for common law fraud, accounting, and unjust enrichment and denying the motion to dismiss Plaintiff's IWPCA claim and conspiracy to commit IWPCA violations claim.

33. Plaintiff Tsybikov now wishes to join another named Plaintiff, Alex Liniou, in the instant First Amended Complaint, file an amended Motion to Certify the Class with this Court, and this Court granted leave for said amendments on November 6, 2019 to be filed on or before November 20, 2019.

34. Separately and apart from this First Amended Complaint, Mr. Tsybikov will be seeking reconsideration of dismissal of certain causes of action by way of a motion to reconsider.

## VI. STATEMENT OF FACTS

10

Plaintiff Ayur Tsybikov's employment

35. During the time of Plaintiff Tsybikov's and others' similarly situated employment with the Defendants, he worked as a truck driver delivering goods across state lines.

36. Mr. Tsybikov worked for DVL as a truck driver between August 2014 and August 2017. He was hired by DVL to work for DVL and its related companies, and drove a truck with DVL branding; Mr. Tsybikov also occasionally pulled loads for Altex Logistics and believes he has been compensated by Altex from time to time.

37. Ayur Tsybikov learned of the truck driver position at Defendant companies through a friend who was employed by Defendants; the friend was leaving the company, and knew that a position would be open.

38. In early August of 2014, Defendant Dovgal conducted a phone interview with Mr. Tsybikov. Mr. Tsybikov was at home, and Defendant Dovgal, presumably was at his DVL office.

39. During Mr. Tsybikov's interview, Defendant Dovgal told him that he could only work for Defendant Company and no other trucking company, and that this would be a full-time commitment on his part. Defendant Dovgal said that he would pay Mr. Tsybikov $0.48 for each mile driven, and said that if he agreed, he could have the job.

40. Defendant Dovgal said to Plaintiff Tsybikov that he always pays his drivers in full all they are promised and on time. This was the first job as a truck driver that Mr. Tsybikov to be had and he had no reason to expect that he would be misclassified, underpaid, defrauded.

41. Mr. Tsybikov accepted the offer. In fact, this agreement's terms were reflected in the very first paycheck and settlement report that Mr. Tsybikov received, under which he was paid 48 cents per mile for the work he performed but was not paid for all the work

he performed.

42. For the first year of Mr. Tsybikov's employment as a company driver, he does not recall signing any documents or contracts and certainly is not in possession of any such documents.

43. A year later, Defendant Dovgal told Mr. Tsybikov to sign a lease agreement. This lease agreement formed part of a misclassification scheme common in trucking companies: Plaintiff would lease a truck from Defendants, and then lease it back to them in order for Defendant companies to enable their drivers to drive under Defendant companies' DOT number and motor carrier authority. Defendant Dovgal said that if Mr. Tsybikov refused to participate in this arrangement, his employment would be terminated.

44. Plaintiff Tsybikov's employment was made up of three phases: first, he worked as a driver compensated on a per mile basis between August 2014 – July 2015- for the first four months he was paid $0.48 per mile, and thereafter was paid $0.53 per mile. In the second phase, he then worked as a driver compensated on a percentage of a load/freight confirmation basis ("per load" basis) from July 2015 until May 2017. In May 2017, he signed a bill of sale for his truck he purchased from DVL in order to become a quasi-owner-operator until he left the company in August 2017. During this "owner-operator" phase, he was also paid on a per load basis.

45. The Defendants failed and refused to pay Plaintiff Tsybikov for some work performed during each of these three phases.

46. When Plaintiff Tsybikov worked on a per mile basis, Defendants only paid him for approximately 90% of the miles he drove, decreasing his compensation by approximately 10%. Plaintiff drove an average of 13,000 miles a month during the period that he was compensated on a per mile basis; as his agreed rate of pay was to be

$0.48/mile for the first four months and $0.53/mile for the next six months, he was underpaid by at least $6,630 during his ten months spent driving on a per mile basis.

47. The reduction in the miles he drove for Defendant companies and based on which he was compensated, arose as a result of the Defendant companies paying "zip code to zip code", as opposed to the odometer miles based on actual routs Plaintiff Tsybikov had to take or was ordered to take.

48. Mr. Tsybikov noticed he was being underpaid, and immediately spoke to other drivers, who reported they have experienced similar underpayment for a long period prior, including prior to Mr. Tsybikov's employment with Defendant companies.

49. When Plaintiff Tsybikov transitioned to compensation on a per load basis in July of 2015, he was given some papers to sign, and had a conversation with Defendants Dovgal and Kim at their office. Defendant Dovgal promised to pay him fairly, and told him, in Russian, that Dovgal didn't "doctor" any figures, and that Plaintiff would be paid 90% of the freight confirmation, and 88% of the same for a partial load, and that he would pay on time. Defendant Kim explained that the only deductions from his compensation would be the standard "lease" payments each month for truck and trailer and insurance, and that he would not be "charged" for any violations or repairs.

50. During Plaintiff Tsybikov's employment as a per load driver, he received plausible freight confirmation figures at first, and then the rates began decreasing. At one point, during the second half of 2015, he received a freight confirmation for $800 and called the broker to check, and the broker said the true confirmation had actually been $1,000. Defendant DVL's dispatcher, and later on Dovgal himself, insisted that $800 was the correct sum, and refused to pay more, thus underpaying Plaintiff by 20%.

51. In sum, throughout his employment with Defendant companies, nearly 90% or more of

freight confirmations, based on which Mr. Tsybikov was paid, were doctored or otherwise falsified by Defendant companies.

52. Upon speaking to other drivers, Plaintiff Tsybikov learned that those paid per load had also been underpaid for many years prior to Plaintiff's employment with Defendant companies but that they were afraid to complain.

53. During Plaintiff Tsybikov's first phase of employment, August 2014-July 2015 as a per mile driver, he was charged $5,500 in deductions from his pay, for reasons such as 'violation' or 'bad tires', which were never discussed or agreed upon. He was also underpaid by approximately 10% of all miles driven; he drove an estimated 13,000 miles per month, and so was underpaid by an approximate $2,496 for his first four months and $5,512 for the next eight months. In total, Plaintiff was underpaid by a total of $16,008.

54. In the 48 months since, $25,405.82 in statutory interest under the IWPCA has accrued, for a total of $41,413.82 to the date of filing this First Amended Complaint.

55. During Plaintiff's second phase of employment, July 2015-May 2017, when he was paid per load as a company driver, he was charged $4,122 in deductions which were never discussed or agreed upon. These included $800 for towing and $3,322.44, deducted over four paychecks, for 'DVL claim' and 'improper delivery conduct'.

56. During this period, or "phase II", Plaintiff was also underpaid for each load by approximately $1,000 per month for twenty months due to Defendant companies paying him based on doctored or falsified freight confirmations. In total, Plaintiff was underpaid by a total of $24,122; in the 26 months since, $16,244.19 in statutory interest under the IWPCA has accrued, for a total of $40,366.19 to the date of filing this complaint.

57. During Plaintiff's third phase of employment, May 2017-August 2017, when he was paid per load as a quasi owner-operator, he was charged $9,330 in deductions which were never discussed or agreed upon. These included $890 for 'truck repair'; $940 for 'violation'; $2,000, $2500 in 'claims for load'; $2,700 for 'bad tires'; and $300 for 'chains'. During this period, Plaintiff was also underpaid for each load by approximately $1,000 per month for four months due to Defendant companies paying him based on doctored or falsified freight confirmations.

58. In total, Plaintiff was underpaid by a total of $13,330 during "phase III"; in the 22 months since, $7,277.91 in statutory interest under the IWPCA has accrued, for a total of $20,607.91 to the date of filing this complaint.

59. Altogether, Plaintiff's damages, inclusive of statutory interest but exclusive of any attorney's fees or filing costs, total $102,387.92.

60. All freight confirmations are strictly in the possession of Defendants. Thus, until full accounting and/or discovery is received, Plaintiff cannot precisely list every instance of underpayment.


Plaintiff Aleh Liniou's employment

61. During the time of Plaintiff Liniou's and others' similarly situated employment with the Defendants, he worked and works as a truck driver delivering goods across state lines.

62. Mr. Liniou worked for DVL between March of 2014 and November of 2019 where he currently works as of the date of filing this Complaint. Throughout that period, Mr. Liniou took several breaks and leave of absences from his employment; some were due to medical issues, such as a six month break for knee surgery to repair a torn meniscus,

and other breaks were an opportunity for Mr. Liniou to gain experience driving other trucks, since DVL only offered flat beds at that time.

63. Ultimately, DVL was a better fit as Mr. Liniou thought at that time, and Mr. Liniou was employed there until the present day.

64. Mr. Liniou was hired by DVL to work for DVL and Altex, and drove a truck with DVL branding; Mr. Liniou also occasionally pulled loads for Altex Logistics and believes he has been compensated by Altex from time to time.

65. Aleh Liniou learned of the truck driver position at Defendant companies through the online forum Chicago.ru.

66. In early March of 2014, Mr. Liniou attended a hiring interview with Defendants Dovgal and Kim at DVL's head office.

67. During Mr. Liniou's interview, Defendants Dovgal and Kim told him that he could only work for Defendant Company and no other trucking company, and that this would be a full-time commitment on his part.

68. Defendants Dovgal and Kim promised to pay Mr. Liniou $0.52 for each mile driven, and to compensate him $75.00 for each 'tarp', $100.00 for each 'layover', and $30.00 for 'extra stops'.

69. Defendant Dovgal and Kim said to Plaintiff that they always pay their drivers in full all they are promised and on time.

70. Mr. Liniou accepted the offer. Defendant Dovgal handed Mr. Liniou some papers to sign, saying he didn't need to know what they contained as it was all "standard stuff", and stated that if Mr. Liniou refused to sign them, his employment would be terminated.

71. Mr. Liniou has low English proficiency, and asked for a translation of the documents, or for time to take the documents home and review them. Defendants Dovgal and Kim

16

refused, stating that Mr. Liniou "did not need" an explanation of the terms contained within the documents. Due to Dovgal and Kim's superior business sophistication and language skills, they convinced Mr. Liniou to trust them and he signed the papers in order to begin working.

72. During Plaintiff Liniou's employment, he was and continues to be charged huge deductions from his pay, throughout each phase of his employment. Mr. Liniou was never warned of these deductions, nor did he ever consent to them, orally or in writing. Mr. Liniou was charged $1,000 for safety board damage, $800 for tires, $300 for log book violations, $1,300 for towing, $350 for trailer damage, and $4,800 for health insurance (for six months at $800 per month). He was also charged $30 per week for logbooks throughout his employment since November 2015, totaling $2,520 through the present day, and $84 per week for physical damages since July of 2019, totaling $1,596 through the present day.

73. Mr. Liniou was twice illegally charged an escrow deposit, which Defendants deducted from his pay. He was charged an escrow of $1,000 in March of 2014, which was later repaid to him in December of 2016, by which time Defendants had incurred statutory interest under the IWPCA for withholding Plaintiff Liniou's pay. Mr. Liniou was then again charged a second escrow of $1,500 in July of 2019, which Defendants never repaid.

74. In total, Plaintiff Liniou was underpaid by a total of at least $14,000-15,000.00, whereby the actual amount of underpayments can be determined only after he obtains all of the requisite records from the Defendant companies.

75. Further, DVL and Altex required Plaintiff Liniou to have a cell phone and an internet if he was to be working for them so that the dispatchers could reach him and so that he

could respond to dispatchers' and other personnel instructions to me during my job duties performance. He was never compensated for his expenses of the phone and internet/data bills. He estimates that collectively, such expenses could amount to a sum in excess of $2500.00.

76. In addition, Plaintiff Liniou was also required to purchase a GPS system so that he could work for Defendant companies, and was never reimbursed for this expense. He paid approximately $400 for the professional GPS device.

77. Accordingly, over the course of Plaintiff Liniou's employment with Defendant companies, he believes that he was unpaid or underpaid by an estimated amount of $19,000-20,000.00.

78. Furthermore, Defendants often made Plaintiff Liniou drive more hours than he physically could, as well as more hours than he was allowed by DOT regulations. Because of the Defendants' demands that he drive an excessive number of hours, he believes that his health was undermined.

79. Defendants doctored Plaintiff Liniou's logbooks after he submitted them to the company office. He has audio and video evidence of the Defendant companies' staff doctoring the logbooks. Recently, he has been refusing to drive an excessive number of hours and he communicated his concerns to Dovgal.

80. Plaintiff Liniou knows other drivers discussed amongst themselves their complaints about identical practices by Defendant companies and Defendants Dovgal and Kim. Namely, being ordered to drive an excessive amount of hours, the logbooks being altered or doctored to reflect lesser time on the road that drivers would actually drive, and that the drivers who were paid on a per mile basis, complained about not being paid for all miles they would drive.

18

81. Similarly, Plaintiff Liniou knows other drivers like him who discussed that the Defendant companies were taking deductions from their pay unjustifiably and to which the drivers did not want to agree to and did not agree to. Plaintiff Liniou has firsthand knowledge that the drivers were afraid to do anything about it as they felt they could not fight back and that they could be fired. He also personally observed Defendant Dovgal making the decisions as to his compensation and policies in the company in general. He personally spoke with Defendant Dovgal about his compensation.

82. Plaintiff Liniou knows that all decisions about underpaying him, deductions from his pay, and other decisions as to his compensation were made personally by Dovgal, Alina and by his staff at his control and direction. This is because Plaintiff Liniou personally discussed the underpayments, escrow, and paychecks with Dovgal. Plaintiff Liniou knew and knows the drivers who work or used to work for Defendant companies who were afraid to complain to Dovgal because they were afraid to be fired.

83. In the time since these deductions were taken, $8,764.19 in statutory interest under the IWPCA has accrued, for a total of $22,580.19 to the date of filing this complaint.

Defendants' control over Plaintiffs' employment

84. Defendant Oleksandr Dovgal ("Defendant Dovgal") and Defendant Alina Kim ('Defendant Kim') and other personnel of Defendant companies managed all of the Plaintiffs' and others' similarly situated work for Defendant Companies, including the number of hours worked, the distances driven, and the tasks performed by Plaintiffs and others similarly situated, including owner-operators.

85. Defendants Dovgal and Kim and other personnel of Defendant companies exerted full control over Plaintiffs' workdays and working conditions. They dictated, controlled and

ratified the wages paid, hours worked, tasks set, and all related employee compensation policies and practices, including that of company drivers and owner-operators.

86. Defendants Dovgal and Kim and other personnel of Defendant companies required Plaintiffs and all other similarly situated truck drivers to review and sign company paperwork in complicated legalese English presented to them at the head office and to complete the inspection of the equipment alongside Defendants' officers at the head office. They also required the Plaintiffs and all other similarly situated truck drivers to submit to mandatory drug testing in nearby Illinois facilities in order to commence employment. These were mandatory conditions of employment, which Plaintiffs had to fulfill in order to continue working for Defendant companies.

87. Defendants Dovgal and Kim required Plaintiffs and others similarly situated to use the Defendants' vehicles in performance of their duties, which were registered in Illinois and owned by Illinois-registered companies and displayed "DVL" signs on the vehicle siding; this company branding is solely owned and managed by Defendants Dovgal and Kim. As a result, Plaintiffs and similarly situated drivers exclusively drove vehicles with the Defendants' branding. The requirement of displaying Defendant companies' signs, branding and DOT MC numbers was equally imposed on all owner-operators as a condition of employment.

88. Some drivers, beginning with around 2014-2015, as in the case of Plaintiff Tsybikov, were required to execute lease agreements to "lease" equipment, *e.g* the truck and trailer, from Defendant companies while one of the Defendant Companies remained the sole owner of such equipment at all times. Specifically, Plaintiff Tsybikov leased his truck from DVL, immediately "lease" the truck back to DVL, and would carry loads for either DVL or Altex Logistics under either company's DOT motor carrier authority.

89. Such leases, which Plaintiff Tsybikov was made to sign, were nothing more than part of the Defendants' intricate, unlawful scheme to misclassify the Plaintiff and others similarly situated drivers as independent contractors, as opposed to W-2 form employees. "Lease" drivers, including Plaintiff, were strictly prohibited from using the trucks in their possession "leased" from DVL to haul loads of any other company but DVL and related to DVL and to work for any other employer.

90. At least approximately 10% of the cargo that the Defendants required the Plaintiffs and putative class members to transport was cargo deliveries to and from the Defendants' customers located in Illinois. In furtherance of their transport duties and work for the Defendants, the Plaintiff and other similarly situated truck drivers spent approximately thirty percent of their time or more commuting through the State of Illinois, regardless of whether Defendants' customers were in Illinois or not. All of the instructions that the Plaintiffs and putative class members would receive came from Defendant companies' dispatchers in Illinois. On information and belief, approximately 70% of the putative class members permanently reside in the State of Illinois.

91. With respect to the owners-operators of their own trucks who worked for Defendant companies, Defendant companies and their executives, Individual Defendants, controlled every aspect of the drivers, including Plaintiffs', work. Such control included, but was not limited to the following:

   a. Defendant companies required Plaintiffs and other similarly situated drivers to comply with instructions dictated by written and unwritten policies, procedures, and directives regarding Plaintiffs' and other similarly situated drivers' duties.

   b. Plaintiffs, as well as other similarly situated drivers, were required to report to or contact dispatchers employed by the Defendant companies in Illinois, at a

pre-set time determined by Defendant companies, at which time the Plaintiffs and other similarly situated drivers are provided with delivery assignments.

c. Plaintiffs and other similarly situated drivers were instructed by Defendant companies which loads to pick up, the location of the loads/goods to be delivered, as well as the time the goods will be loaded onto the equipment. Plaintiff and other similarly situated drivers had and have no discretion with respect to which loads they would pick up or deliver or when. Additionally, the Defendant companies dictated and dictate the time by which the delivery must be made.

d. Defendant companies employed and employ managers who had supervisory responsibility over Plaintiffs and other similarly situated drivers, and who could and did assign and direct their work.

e. Plaintiffs and other similarly situated drivers were required to purchase and carry GPS, which allows the Defendant companies' personnel to track where the drivers are throughout the day. Defendant companies' dispatchers and supervisors also communicated with the Plaintiff and similarly situated drivers while they are driving via telephone in order to convey instructions and otherwise oversee the drivers.

f. In order to be hired as owners-operators, the Plaintiffs and other similarly situated drivers were required to undergo background checks and drug tests.

g. Defendant companies required Plaintiffs and other similarly situated drivers to obtain

insurance from an insurer dictated by Defendant companies in specific amounts such as nontrucking liability insurance, occupational accident insurance,

property damage and cargo insurance.

h.   If the Plaintiffs or other similarly situated drivers wish to take time off, the Defendant companies required them to give timely advance notice, and the Plaintiffs and other similarly situated drivers would be disciplined or terminated if they failed to provide such notice.

i.   Defendant companies' personnel advised Plaintiffs and other similarly situated drivers that their refusal to drive a load that had been assigned to them would result in immediate termination of their employment.

92. As part of their strict control over Plaintiffs' work, Defendants Dovgal and Kim required that the Plaintiffs and putative class members submit all bills of lading, logbooks, and other required paperwork to the Defendant Companies' head office in Illinois. This requirement was imposed on drivers operating Defendant companies' equipment and owner-operators.

93. At no time during their employment, be it as a company equipment driver or owner-operator, could the Plaintiffs and other similarly situated drivers have their own customers and never had their own customers, could not choose and did not choose their own routes for delivery of cargo, could not and did not receive compensation or otherwise exchanged payment for their delivery other than being compensated by the Defendant companies, could not and did not negotiate any matters or bargains with any customers or brokers.

94. Plaintiffs and other similarly situated truck drivers shared similar job titles, followed the same policies and practices, performed similar duties, and as a result of Defendants' common scheme and unlawful deductions, were similarly subject to exploitation and denied compensation.

95. Defendants engaged in unlawful practices by refusing to withhold payroll and social security taxes or to pay their share of social security tax and unemployment tax for the benefit of Plaintiffs, and as to others similarly situated, thus causing Plaintiffs and others similarly situated damages in the amount of unpaid FICA and withheld taxes and additional sums to be paid by the Plaintiff and others similarly situated in place of Defendants.

## Liability of individual defendants Dovgal and Kim

96. Defendants Dovgal and Kim had knowledge of the mutual assent between the Plaintiffs and Defendant companies to compensate the Plaintiffs for all of their work because the individual Defendants had themselves offered employment to Plaintiffs and promised to compensate them in full and on time based on a certain rate.

97. Defendants Dovgal and Kim similarly had knowledge of mutual assent between Defendant companies and other drivers as to the drivers working for the Defendant companies in return for compensation based on per mile basis or per hauled load basis and that the mutual assent to employment terms was formed based on promises to pay in full and on time.

98. Dovgal and Kim had knowledge of all agreements that the putative class members executed with Defendant companies because Dovgal and Kim were the ones to proffer such agreements to the drivers and execute such agreements on behalf of the Defendant companies.

99. Individual Defendants had actually entered into oral agreements with Plaintiffs and other similarly situated drivers (putative class members) on behalf of the Defendant Companies, and induced the Plaintiffs and other similarly situated drivers to enter into

said agreements and to work for the Defendant companies. Plaintiffs began working as a result of promises by Dovgal and Kim that Defendant companies would pay the drivers the promised compensation in full and on time and that they were paying current drivers' compensation in full and on time.

100. Defendants Dovgal and Kim knowingly permitted or otherwise caused Defendant companies to wrongfully deny the payment of compensation to Plaintiff and putative class members by actively and affirmatively directing the Defendant companies' personnel to deny the earned and promised compensation.

101. Both individual Defendants established policies for Defendant companies which violated the IWPCA: (1) at the beginning of running their transportation services enterprise, on or about September of 2011, when DVL Express was incorporated, Dovgal and Kim devised a scheme to misclassify the truck drivers as Independent Contractors and consequently, (2) underpay the Plaintiffs and putative class member truck drivers, and (3) make deductions from the compensation of Plaintiffs and other similarly situated drivers.

102. Once the Defendant companies began hiring drivers, Defendants Dovgal and Kim implemented their scheme to violate IWPCA and commit fraud by having: (1) instructed Defendant companies' personnel employees to issue the paychecks which reflected underpaid or reduced compensation and instructing Defendant companies' personnel to apply various deductions to Plaintiff's compensation and compensation of similarly situated drivers; (2) as in some instances, refused to issue, or directed the Defendant companies' personnel to refuse to issue, any paychecks at all to Plaintiff and other similarly situated drivers- putative class members; and (3) instructed Defendant companies personnel to doctor or otherwise falsify log books and freight/load rate

25

confirmations.

103.    Defendants Dovgal and Kim implemented their exploitative scheme in full knowledge that most of the truck drivers they hired would take the job offered, not complain about underpayment of wages, and not seek any recourse in court or otherwise with government authorities. Dovgal and Kim targeted drivers who were and are immigrants, had low English language proficiency and lacked legal sophistication, so as to ensure a consistent power imbalance, which the individual Defendants used to their advantage and profit.

104.    Instead of running an honest business, Defendants Dovgal and Kim designed the above-described scheme of deductions and wage withholdings to take money from hard-working, vulnerable employees who could not or would not fight back.

105.    Defendant companies' practices, as set up and implemented by Individual Defendants, violated multiple provisions of the Illinois Wage Payment and Collection Act.

106.    As a result of Defendant companies' unlawful practices, as set up and implemented by Individual Defendants, the Defendant companies and Individual Defendants profited immensely. They benefited from reduced labor and payroll costs by making illegal deductions and otherwise withholding pay from Plaintiff and similarly situated drivers, as well as by doctoring logbooks and freight/load confirmations.

107.    As a result of Individual Defendants' improper and willful actions causing the Corporate Defendants to fail to pay Plaintiffs and others similarly situated in accordance with the requirements of the IWPCA, Plaintiffs and others similarly situated putative class members suffered lost wages and other actual damages.

108.     Plaintiff further alleges that in addition to statutory violations, Individual Defendants engaged in a pattern of fraudulent inducement, fraudulent misrepresentation and fraudulent concealment as to him and similarly situated drivers. Defendants Dovgal and Kim also conspired to commit these common law offenses and the IWPCA violations, personally and on behalf of their respectively owned companies.

## VII. CLASS ALLEGATIONS

109.     Plaintiffs bring these claims for relief on their own and as a class action pursuant to Fed R. Civ. P. 23. The class is defined as:

> *"All persons who have worked for Defendant companies as truck drivers and truck driver trainees in Illinois or otherwise have driven Defendant companies', their predecessors', successors', subsidiaries' and/or affiliated companies' trucks at any time during the relevant statutory period, and who entered into an Independent Contractor agreement individually or on behalf of another entity, oral or written, and personally provided freight cargo transportation services pursuant to that Agreement for Defendant companies and who have not been classified as employees of Defendant companies".* (Count I).

> *"All persons who have worked for Defendant companies as truck drivers and truck driver trainees in Illinois or otherwise have driven Defendant companies', their predecessors', successors', subsidiaries' and/or affiliated companies' trucks at any time during the relevant statutory period, and personally provided freight cargo transportation services, against whom the Individual Defendants, on behalf of themselves and their respective Corporate Defendants, committed Civil Conspiracy to violate IWPCA and*

*perpetrate Common Law Fraud (promissory fraud, fraudulent misrepresentation or fraudulent concealment)."* (Count II).

110.    The class or subclasses of plaintiffs, estimated 1000 drivers, is so numerous that joinder of all members is impracticable;

111.  There are common questions of law and fact as to whether Defendants improperly misclassified the drivers as independent contractors and the drivers were and are in fact covered by the IWPCA; whether the drivers are entitled to recover the amounts deducted by the Company from their wages and an unpaid but earned compensation; that each driver has the same potential claim and types of damages, and these common questions of law and fact predominate over any possible questions affecting only individual members;

112.    The named Plaintiffs and their attorney will adequately protect the interests of the entire class.

113.    Class treatment in this particular case is the only appropriate means for the fair and efficient adjudication of the controversy because of the length of the dispute, the intimidation and retaliation threats and actions by Defendant over the course of many years, the amount of individual damages and the prohibitive costs of individual suits.

**Numerosity**

114.    The total number of members of the proposed class represents approximately 1000 individuals or more. The exact number of class members may only be determined from Defendants' records. The proposed class is sufficiently numerous to make joinder of all of its members impracticable.

115.    The proposed class of approximately 1000 Defendants' truck drivers, who were

misclassified as independent contractors, denied full wages, proper payroll contributions and were not covered by workers' compensation and unemployment insurance, to name just a few of Plaintiffs' contentions, represent a sufficient number of individuals with respect to their complaint against Defendants.

116.    The amount of each claim is relatively small compared to the costs of bringing an individual claim, particularly when considering filing fees, motion practice, discovery, and the costs of commuting to depositions, appearing in court, hearings, and trial.

117.    The amounts of Plaintiffs' and putative class members' claims are very similar and range approximately between approximately $1,500 and $55,000, depending on the length of the employment, not including statutory interest and attorneys' fees and costs. These amounts are based on what Plaintiffs can ascertain based on documentation they currently possess, and could change upon the review of all relevant documentation in possession of Defendants. The amounts claimed vary based on the length of truck drivers' employment with Defendants. The amounts do not include contributions under FICA, penalties and interest which may only be determined after determining the full compensation that Defendant was required to pay Plaintiffs.

118.    The putative class members do not have the ability to bring the claims on their own behalf because of the prohibitive costs. Even if they had the ability to bring a suit on their own behalf, the likelihood of them doing so would be close to zero.

119.    The Plaintiffs believe that Defendants would intimidate Plaintiffs and putative class members and Plaintiffs and putative class members would not be able to oppose the Defendants if they were to stand up for their rights in court individually. Defendants oppressed them, violated their rights repeatedly and without any remorse, and intimidated them throughout the length of Plaintiffs' and putative class members'

employment. Defendants are highly likely to continue with the same tactics if Plaintiffs and other drivers were to sue individually or as a joinder.

120.    There are at least approximately 1000 putative class members scattered across Illinois and the United States, who are truck drivers involved in an ongoing commute. It would be impractical and impossible for the Plaintiff to prosecute their claims individually or as a joinder because of geographic constraints.

121.    The proposed class is made up of the "smaller guy". The class consists of individual truck drivers, who, for the most part, are newly licensed commercial drivers, who are not sufficiently sophisticated to seek legal redress individually.

122.    Joinder of all or even a substantial percentage of class members as individual plaintiffs clearly would be prohibitively expensive and impracticable for the same reason as if plaintiffs were to bring their claims individually.

**Commonality**

123.    All of Plaintiffs' and putative class members' claims have common questions of law because they all arise pursuant to violations of IWPCA and other common law causes of action, as described in this Complaint. There are numerous and substantial questions of law and fact common to all members of the stated class, including, but not limited to, the following:

124.    Whether Defendants unlawfully misclassified putative class members as independent contractors as opposed to W2 employees;

125.    Whether Defendants failed to pay "wages" and "final compensation" by making unlawful deductions or withholdings from Plaintiffs' paychecks;

126.    Whether Defendants failed to make proper payroll contributions and other tax contributions and withholdings on behalf of Plaintiffs;

127.    Whether Defendants failed to compensate class members for all the work they required according to the rate and wages Defendants promised to pay Plaintiffs and others similarly situated at hiring;

128.    Whether Defendants engaged in a pattern, practice or policy of making unlawful deductions from the pay of class members;

129.    Whether Defendants willfully failed to comply with state wage laws pursuant to IWPCA;

130.    Whether Defendants failed to pay final compensation to members of the proposed class, on time and in full, in accordance with IWPCA;

131.    Whether Defendants failed to compensate the truck drivers-trainees, to whom the Defendant promised compensation and with whom Defendants formed an employment agreement for trainees' training for benefit of Defendants and provision of services to Defendants;

132.    Whether Defendants violated Section 3 of IWPCA which requires that every employer, at least semi-monthly, pay every employee all wages earned during the semi-monthly pay period. 820 ILCS 115/3;

133.    Whether Defendants violated Section 4 of IWPCA which requires that all wages earned by employee during the semi-monthly or bi-weekly pay period be paid to such employee not later than 13 days after the end of the pay period in which such wages were earned. 820 ILCS 115/4;

134.    Whether Defendants violated Section 5 of IWPCA which requires every employer to pay final compensation of separated employees in full, at the time of separation, if possible, but in no case later than the next regularly scheduled payday for such employee. 820 ILCS 115/5;

135.    Whether Defendants violated Section 9 of IWPCA which dictates that deductions by employers from wages or final compensation are prohibited unless such deductions are (1) required by law; (2) to the benefit of the employee; (3) in response to a valid wage assignment or wage deduction order; (4) made with the express written consent of the employee, **given freely at the time the deduction is made** […]. 820 ILCS 115/9. *(emphasis added)*;

136.    Whether Defendants violated Section 10 of IWPCA, when they failed to notify employees, at the time of hiring, of the actual rate of pay and of the time and place of payment; when they failed to memorialize such notification in writing although it was feasible; when they failed to assure that both parties, the Employer and the prospective truck driver, acknowledge such notification in writing; when Defendants failed to notify employees of any changes in the arrangements, specified above, prior to the time of change; when Defendants failed to keep records of names and addresses of all employees and of wages paid each payday, and when Defendants failed to furnish each employee with an itemized statement of deductions made from their wages for each pay period. 820 ILCS §115/10.

137.    Whether individual Defendants Dovgal and Kim are liable for violations of IWPCA.

138.    Whether Defendants are liable for fraud in the inducement, fraudulent misrepresentation, fraudulent concealment, conspiracy to commit the aforementioned fraud, and conspiracy to violate the IWPCA.

139.    Whether Plaintiff and all class members are entitled to equitable relief pursuant to their actions for accounting, declaratory judgment, and unjust enrichment.

140.    Upon information and belief, there are no other class members who have an

interest individually controlling the prosecution of his or her individual claims, especially in light of the relatively small value of each claim and the difficulties involved in bringing individual litigation against one's employers. However, if any such class member should become known, he or she can "opt out" of this action in accordance with federal rules of civil procedure as applicable to actions pursuant to IWPCA.

141. Plaintiff anticipates that Defendants will raise defenses that are common to the class.

**Typicality**

142. The named Plaintiffs are adequate representative of the class because all potential plaintiffs were subject to Defendants' uniform practices and policies. Further, the named Plaintiffs and the potential class plaintiffs have suffered the same type of damages as a result of Defendants' practices and policies.

**Adequacy**

143. The named Plaintiffs will fairly and adequately protect the interests of the class.

144. Plaintiff Tsybikov is ideally situated to represent three potential sub-classes: (1) company truck drivers compensated on a per mile basis; (2) company truck drivers operating under "lease" agreements and compensated on a percentage of a freight/load confirmation basis; and (3) owner-operators of their trucks and compensated on a percentage of a freight/load confirmation basis, as he worked under all three categorizations for Defendant companies. Both named Plaintiffs are ideally situated to represent the first sub-class of drivers compensated on a per mile basis.

145. Plaintiffs' interests are not and cannot be antagonistic or in conflict with the class as Plaintiffs and all members of proposed class would like to seek compensation for the

work they performed. The named Class Representative and proposed class members have the common interest of determining whether Defendants are liable for money damages to the proposed class for violations of their rights under IWPCA, and under causes of action under Illinois Common Law as set forth in this Complaint.

146.    Plaintiffs have retained experienced counsel who is competent in handling complex litigation with many years of experience in prosecuting Wage and Hour actions in Illinois state court, and recently in Federal Court, including numerous Class Action lawsuits pursuant to IWPCA.

Rule 23(b) Class Action Maintainable

147.    Finally, a class action is the only realistic method available for the fair and efficient adjudication of this controversy. The expense and burden of individual litigation make it impractical for members of the Class to seek redress individually for the wrongful conduct alleged herein. Were each individual member required to bring a separate lawsuit, the resulting multiplicity of proceedings would cause undue hardship and expense for the litigants and the Court and would create the risk of inconsistent rulings which would be contrary to the interest of justice and equity.

### VIII. COUNT I: VIOLATIONS OF THE ILLINOIS
### WAGE PAYMENT AND COLLECTION ACT

148.    Plaintiffs re-allege and incorporate paragraphs 1 through 147 above as and for paragraph 148 of this Count I.

149.    Each corporate Defendant is an "employer" within the meaning of Section 115/2 of IWPCA. Each individual Defendant is an "employer" within the meaning of Section 115/2 of the IWPCA.

150.    Defendants violated Section 115/2 of the IWPCA by misclassifying Plaintiffs and

those similarly situated.

151.    Defendants violated Section 115/3 and Section 115/4 of the IWPCA by failing to pay Plaintiffs and those similarly situated their wages in a timely manner.

152.    Defendants violated Section 115/5 of the IWPCA by failing to pay Plaintiffs their final compensation in full and in a timely manner.

153.    Defendants violated Section 115/9 of the IWPCA by making unauthorized deductions from the paychecks of Plaintiffs and those similarly situated. These deductions were not required by law, did not benefit Plaintiffs, were not made in response to a valid wage assignment order, and were not made with the express written consent of employees.

154.    Defendants violated Section 115/9.5 of the IWPCA for failing to reimburse the current employees-drivers (or otherwise employed since January 2019) for all necessary expenditures or losses incurred by the employees-drivers within the corporate Defendants' scope of employment and directly related to services performed for the Defendant companies beginning with January 1, 2019, including Plaintiff Liniou.

155.    Defendants violated Section 115/10 of the IWPCA by failing to notify Plaintiffs and those similarly situated of their true rate of pay in writing or orally at any point.

156.    The total amount Mr. Tsybikov's damages for the three years of his employment with Defendant companies is approximately **$55,082** without interest accrued, and **$102,387.92** with interest accrued to date but excluding attorney's fees and costs.

157.    The total amount of Plaintiff Liniou's damages is **$13,816**, to date, and in the time since these deductions were taken, **$8,764.19** in statutory interest under the IWPCA has accrued, for a total of **$22,580.19** to the date of filing this complaint.

158.    Individual Defendants Dovgal and Kim are personally liable for the corporate

Defendants' violations of the IWPCA, pursuant to Section 115/13 of the IWPCA because they intentionally or otherwise knowingly permitted Corporate Defendants to violate IWPCA.

159.     Defendants are liable for all interest incurred, and attorney's fees and costs, pursuant to Section 115/14 of the IWPCA.

Punitive Damages

160.     Defendants knowingly and willfully violated the IWPCA, being employers, who, being able to pay wages, and being under a duty to pay, willfully refused to pay as provided in the IWPCA, with intent annoy, harass, oppress, hinder, delay and defraud their drivers.


## IX. COUNT II: CIVIL CONSPIRACY

161.  Plaintiff re-alleges and incorporates paragraphs 1 through 160 above as and for paragraph 161 of this Count II.

162.  At the time when Defendants Dovgal and Kim incorporated and set up DVL Express in 2011, these two individual Defendants entered into an agreement with each other to defraud the truck drivers they were to hire, misclassify them as independent contractors as opposed to employees as to further violate various provisions of the IWPCA by taking unlawful deductions of chargebacks of expenses, fines and penalties. They further developed their agreement in the following years as to forge or "doctor" logbooks and freight confirmations based on which the drivers' compensation would be calculated and paid

163.  Individual Defendants knew that they would represent false statements of material fact to Plaintiffs and others similarly situated and conceal material facts from them in

order to induce them to accept employment offers with Defendant companies.

164. Individual Defendants also knew that to implement and further their scheme to defraud and to violate IWPCA, as well as multiple other laws and regulations, both state and federal, they would need to have an agreement to perpetrate the fraud and implement the misclassification and underpayment schemes, and to act in concert to ensure that all Corporate Defendants and their agents and employees comply with their fraudulent intent.

165. Individual Defendants developed a scheme to misclassify the truck drivers as independent contractors, to withhold the compensation from truck drivers, to not pay them in a timely manner, and not pay them final compensation and all wages that they would earn. In short, they conspired to set up a scheme to violate Section 2 of IWPCA by misclassifying their employees-truck drivers as independent contractors and then multiple provisions of IWPCA.

166. Individual Defendants knew that they had no right under the IWPCA to withhold wages Plaintiffs and others similarly situated drivers earned.

167. By their actions, Defendants caused and continue to cause injury to Plaintiffs and others similarly situated by way of unpaid wages, unpaid final compensation, untimely and delayed payment of wages, by not paying payroll tax, unemployment insurance, workers compensation, and other like contributions on behalf of Plaintiffs and others similarly situated to relevant state and federal agencies.

168. Individual Defendants committed overt acts in furtherance of the common scheme by advertising job positions with Corporate Defendants, interviewing Plaintiffs and others similarly situated, making false statements of material facts and withholding true material facts, by offering them jobs and hiring them but then misclassifying them as

independent contractors, by not paying them wages earned and final compensation, by forging documents or directing Corporate Defendants' personnel to forge the documents, such as logbooks and freight/load confirmations, based on which the reduced compensation was calculated and paid..

169.   Individual Defendants committed civil conspiracy against Plaintiffs and others similarly situated. Namely, to commit IWPCA violations. The actions of Individual Defendants and the conduct constituting civil conspiracy are imputed to Defendant companies that each individual Defendant respectively owns, controls, directs and operates.

170.   Defendants' conspiracy against Plaintiffs and others similarly situated is vexatious, harassing, and in bad faith.

171.   That in addition to the amount of wages and/or final compensation the Defendants owe Plaintiffs and others similarly situated drivers as a result of their conspiracy to defraud them and violate IWPCA, and attorneys' fees and costs incurred as a result of this action,  Plaintiffs and others similarly situated drivers are also entitled to punitive damages because:

172.   The commission of civil conspiracy in Illinois is an intentional tort, and also is a violation of Illinois Wage Payment and Collection Act, whereby the knowingly and willingly committed violation of that Act also constitutes a criminal violation of the laws of this state (820 ILCS 115/14); and

173.   Individual Defendants' civil conspiracy was and is a deliberate attempt to lure Plaintiff and other similarly situated drivers into working for Defendant companies without due compensation for their service, as well as annoy, harass, oppress, and intimate Plaintiff and others similarly situated - who do not have the financial and legal

resources that the Defendants have at their disposal - into abandoning a legal right which Plaintiff and others similarly situated properly asserted (*i.e.* to be paid the compensation by their employer which, by all accounts, they have earned and which is due and owing pursuant to the Illinois Wage Payment and Collection Act).

### X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Honorable Court:

a.  Certifies the class and appoint Plaintiffs and Plaintiffs' counsel to represent the class;

b.  Finds that the Corporate Defendants violated the Illinois Wage Payment and Collection Act, 820 ILCS § 115/1, § 115/2, § 115/3, § 115/4, § 115/5, § 115/9, § 115/10, and § 115/14, hold the Defendant companies severally and jointly liable for damages in excess of $5,000,000.00, and that Individual Defendants are personally jointly and severally liable for the Corporate Defendants' violations of IWPCA under Section 13 of the IWPCA;

c. Finds that Defendants Dovgal and Kim entered into a conspiracy to commit violations of the IWPCA, for their own personal benefit and for the benefit of respectfully managed principal Corporate Defendants;

d.  Requires that the Defendants must pay punitive damages for their willful and wanton conduct as alleged herein;

e.  Awards statutory attorneys' fees and costs pursuant to 820 ILCS § 115/14(a) or pursuant to a judgment on Common Law causes of action of civil conspiracy, as well as punitive damages, and

f.  Grants such other relief as this Court deems appropriate.

Respectfully submitted,

By: *Julia Bikbova*
_____
Julia Bikbova, Plaintiffs' Attorney

Julia Bikbova
Bikbova Law Offices, P.C.
666 Dundee Road, Suite 1604
Northbrook, IL 60062
(847) 730-1800
julia@bikbovalaw.com
ARDC 6291400

## CERTIFICATE OF SERVICE

I, Julia Bikbova, hereby certify that on November 20, 2019, the foregoing was filed electronically. Notice of this filing will be sent to the following individual by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Michael A. Haber
Cara M. Gaziano
Jamie L. Ross
Kalcheim Haber, LLC
134 N. LaSalle Street, Suite 2100
Chicago, IL 60602
Ph: 312-236-9445
mhaber@kalcheimhaber.com
cgaziano@kalcheimhaber.com
jross@kalcheimhaber.com

*Julia Bikbova*
Julia Bikbova, Attorney for Plaintiffs